No. 25,579.

JAMES L. SHRIVER, *Appellee,* v. UNION STOCK YARDS NATIONAL BANK and S. C. TUCKER, *Appellants.*

SYLLABUS BY THE COURT.

1. FRAUDULENT REPRESENTATION—*Sale of Corporate Stock—Statement That Account of the Corporation With the Bank Had Been "Very Satisfactory" Interpreted.* In a letter written by the president of the bank and furnished to another corporation, to be used by it in selling its preferred stock, in which letter it is stated that the account of the corporation with the bank had been "very satisfactory," it is *held,* these words do not mean satisfactory to the writer, but constitute a representation of fact to the investing public that the account of the corporation with the bank had to a high degree produced satisfaction and relieved the minds of the bank officials from doubt and uncertainty.

2. SAME—*When a Statement of Opinion is Equivalent to Affirmation of Fact.* Where the writer of a letter, given to a corporation to be used by it in selling its preferred stock, has superior knowledge or means of knowledge as to its financial condition, a statement of opinion as to its financial condition amounts to an affirmation of fact, and is at least a representation of fact that the opinion expressed exists.

3. SAME—*False Representation—Evidence Sufficient to Go to the Jury.* In an action against a bank and its president for damages sustained by the purchase of stock of another corporation, because of representations of fact made by the president of the bank, the evidence is examined and held sufficient to go to the jury in respect to the issues (*a*) of falsity of representation, (*b*) scienter, and (*c*) ratification by the bank of the act of its president.

4. SAME—*Letter Properly Deposited in Mail—Presumption of Its Reception.* When a letter or other mail matter is shown to have been properly addressed and mailed with postage prepaid, it is a rebuttable presumption of fact that it was received by the addressee, and an instruction to that effect is not erroneous.

5. SAME—*Money Obtained by Fraud—Interest Allowable.* . In an action to recover money paid for shares of corporate stock, which plaintiff was induced to buy through fraudulent representations of defendant, interest is properly allowed by way of damages against the defendant, who received the money, for the time such defendant has had the use of it.

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed February 7, 1925. Affirmed.

*C. H. Brooks, Willard Brooks,* and *Howard T. Fleeson,* all of Wichita, for the appellants.

*Lewis A. Hasty, Robert R. Hasty,* and *Lester G. Seacat,* all of Wichita, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: Plaintiff sued the Union Stock Yards National Bank, S. ·C. Tucker and others, to recover $2,000 which he. had paid for preferred stock in the H-Q Hay and Grain Company, alleging that the stock was worthless, and that he had been induced to buy the same because of the fraud and deceit of defendants. The case was tried to a jury, who answered special questions and returned a general verdict for plaintiff. The defendants have appealed.

The Union Stock Yards National Bank was engaged in the banking business with offices in the Live Stock Exchange Building at Wichita. Associated with it was the Wichita Cattle Loan Company, a corporation engaged primarily in making loans on live stock. The two corporations were owned in most part by the same stockholders, occupied the same rooms, used the same clerical force, and had the same managing officers. Mr. S. C. Tucker was president of both corporations. Mr. Ed. L. Hart, Jr., was cashier of the bank and treasurer of the Cattle Loan Company, and Mr. Chas. Pasche was assistant to the president of both corporations.

The H-Q Hay and Grain Company, hereinafter called the grain company, was a corporation organized in July, 1916, with a capital stock of $2,500, which was paid and owned one-half by Clyde C. Whiteley and one-half by Claude Shaft. The charter was amended in January, 1918, increasing the capital to $10,000, owned three-fourths by Shaft and his two brothers and one-fourth by Whiteley. It was again amended in October, 1919, increasing the capital stock to $25,000, owned in the same proportions. No new capital was put into the business because of these increases of capital stock; this was said to have been justified by earnings as shown by the book value

of the assets of the company. In December, 1919, the charter was again amended by increasing the capital to $50,000. About this time the Shafts sold out to Whiteley. Of this increase in capital stock $10,000 was issued to Whiteley, for which he gave his note to the company, with the stock as security, which note was never paid. It is not clear what became of the remaining $15,000 of this increased capital.

The principal business of the grain company was the purchase of alfalfa hay, grinding it into meal and selling the meal. It had a mill for this purpose at Valley Center, which was situated on the right of way of the railway company. The buildings and machinery were purchased in 1919 for $6,500, to be paid in monthly payments, of which about $3,000 was unpaid in July, 1920. Since the purchase some new machinery had been placed upon this property at a cost of $4,000 or more. The company also had two acres of land near the terminal elevator at Wichita. This had been purchased from the elder Mr. Shaft upon a contract, which was placed in escrow in the defendant bank, upon which about $3,000 was to be paid before deed would be delivered. What had been paid on it is not shown. On this tract the company had built of galvanized iron a warehouse for the storage of hay and feed, the cost of which is not shown; there was also situated on this property a small residence. These properties were valued in their statement of July 1, 1920, at about $30,000.

The grain company had offices on the second floor of the Live Stock Exchange Building at Wichita, and did its banking business with the Union Stock Yards National Bank, and borrowed from the bank from time to time large sums of money. When these loans were more than the bank could legally make to one customer, the notes were made to the Wichita Cattle Loan Company, but for the purpose of this suit they are all regarded as loans of the bank.

On January 1, 1920, the grain company owed the bank and loan company $25,000 on unsecured notes. This sum varied from time to time in the months following, running as high as $50,000, and was $31,000 on June 5 and $38,000 on July 15. The deposits of the grain company in its account with the bank were largely made up of sight drafts with bill of lading attached, for hay and feed that had been sold. Frequently the drafts would not be paid and would be charged back. These deposits varied in the first half of 1920 from about $167,000 in aggregate deposits in January to

about $70,500 aggregate deposits in June. The average daily balance of the grain company in its account at the bank for the months in the first half of 1920 varied from $258.74 in February to $1,980.84 in April, but in March, 1920, there was an average overdraft of $1,587.30. In the first six months of 1920 there were 52 days when the grain company's account with the bank was overdrawn. These overdrafts ran as high as $8,000, and frequently were from $2,000 to $5,000. The bank charged interest at the rate of 8 or 9 per cent on its loans, also on the overdrafts and sight drafts while in process of collection, and exchange on the drafts.

Some time in June, 1920, the officials of the grain company concluded to endeavor to sell an issue of preferred stock, and for this purpose got in touch with Mr. Ray W. Snyder, a stock broker of Wichita, who had handled several issues of stock of various kinds, and who was in touch with investors of that class of securities. The balance sheet of the grain company on June 1, 1920, showed a loss of about $10,000 since January 1. This was said to have been brought about, in part at least, by the difficulty in getting cars for shipment, and the officials of the grain company thought by moving their mill from Valley Center to the site of their warehouse at Wichita they would be able to get cars more readily and avoid the loss their business was then suffering.

The issue of this preferred stock was talked of by Mr. Whiteley with the officials of the bank and Mr. Snyder. There was prepared an application for the increase of the capital stock to $75,000, $25,000 being preferred stock, which application was made to the charter board on June 25, 1920, and granted on July 5. A prospectus was prepared, showing the picture of the mill at Valley Center, the picture of the warehouse site at Wichita as it was, and also a picture from a drawing of the Wichita site as it would appear when the mill at Valley Center was moved to that place and in operation. The prospectus consisted of four pages, the first of which stated, among other things:

"Business: The H-Q Hay and Grain Company is a corporation engaged in the handling of hay and grain and the manufacture of alfalfa hay into alfalfa meal. The business has grown from a small beginning and is therefore well rooted. The company owns a mill and complete equipment located at Valley Center, Kan., and a site and warehouse property in the terminal district, Wichita. Offices are in the Live Stock Exchange Building, Wichita.

"Purpose of issue: To provide funds for the erection of buildings on the Wichita site and the removal of the mill equipment to the combined property.

41—117 KAN.

Photographs of the mill and site are shown on the next page and a sketch of the combined mill as at present planned."

The second and third pages contained a statement signed by Clyde C. Whiteley, as president, addressed "To whom interested," and stated, among other things, that the grain company was incorporated in 1916 with a capital of $2,500. "The earnings have been satisfactory, show a gradual growth," giving figures for the four years. "Practically all of these earnings were put back in the business. These, together with the original paid-in capital, plus $10,000 later paid in, make up the present issued capital stock of $35,000." It described the mill at Valley Center and said. "This building after the removal of the machinery will be used for warehousing. . . . At Wichita the property consists of a warehouse, located on two acres of ground. . . . The funds derived from this issue, it is estimated, will be ample to effect the proposed changes," which should about double the capacity of the mill. "When removed we intend to operate our mill day and night. This should give us maximum earnings on the invested capital. . . . As to the security, we have done everything we thought might protect the funds invested. . . . The funds derived will be carefully expended for what we believe to be a necessary and conservative betterment of the business. . . . There is no doubt as to our ability to pay the guaranteed dividend of 8 per cent on this issue. Our earnings have always been very ample to do this."

The last page of this prospectus contained this letter:

"THE UNION STOCK YARDS NATIONAL BANK.

"To Whom it May Concern: "WICHITA, KANSAS, June 25, 1920.

"The H-Q Hay and Grain Company have had their account with this bank from the time their business was started in 1916. The account has always been very satisfactory and well taken care of. The company is efficiently managed, and we have a very high estimate of the personal ability and moral character of the men behind this business.

"We believe that funds invested in the securities of the company would be conservatively placed where there are good possibilities for good profit.

"We shall be glad to give further information relating to this company to any one interested.

THE UNION STOCK YARDS NATIONAL BANK.
(Signed) S. C. TUCKER, *President.*"

This letter from the bank appears from the evidence to have been given and used under the following circumstances: When Whiteley was preparing to issue the preferred stock he and Snyder talked with

Mr. Tucker, Mr. Pasche and Mr. Hart of the defendant bank about the matter, going over the situation thoroughly. At the suggestion of some one, just whom is not clear, the officers of the bank agreed to give the grain company a letter which might be used in the sale of the. stock. Later a letter was prepared, perhaps by Mr. Pasche, and sent to the grain company's office, which Mr. Snyder describes as "a mere jumble of words." Snyder then prepared a letter, and he and Whiteley took it to the bank, but finding none of the officers there except Mr. Tucker, he showed the letter to Mr. Tucker and told him either to sign it or redictate something similar, or he would not handle the issue of preferred stock. Mr. Tucker studied a minute, read the letter over and finally signed it. The letter was then printed on the prospectus, 500 copies of which were issued, one of which was mailed to the bank. Mr. Hart states that he never saw this particular letter until it was shown in court, but he did know in July or August that such a letter had been furnished and was being used. Mr. Pasche was away part of the summer, but on his return to Wichita he learned of such a letter, though perhaps he did not see it until it was shown in court. ·

Mr. Whiteley devoted most of his time for the two months in July and August in endeavoring to sell preferred stock and in assisting Mr. Snyder to sell it. In the meantime the business of the grain company was handled largely by Miss Lavone Smith, secretary of the company and its bookkeeper.

About September, 1920, through the suggestion of the officials of the bank, Mr. Whiteley discontinued his connection with the grain company, and Mr. Ed. T. Hart, Jr., was placed on the board of directors in his stead, and Mr. Claude Shaft was employed as manager. About that time Mr. Snyder refused to sell any more of the stock. Soon thereafter, in November, 1920, the grain company executed to the bank mortgages upon all of its property to secure the notes then held. The grain company continued to operate until about April, 1921, when it could no longer do business, and the mortgages which it had given to the bank were foreclosed.

The evidence of the plaintiff was that he bought $2,000 worth of the preferred stock through Snyder and Whiteley, relying upon the statements in the prospectus and the certificate of stock issued to him, and largely relying upon the letter of the bank. This purchase was made August 30, 1920. A trial balance of the grain company's business of September 30, 1920, shows losses since January· 1 of $18,499.12.

Preferred stock to the amount of $13,000 was sold. When. the money began to be received from the sale of preferred stock there was quite a little talk as to what should be done with it. Mr. Snyder instructed Miss. Smith to be careful how that money was handled. She talked with Mr. Pasche of the bank about it, and there was some talk that it would be placed in another bank in a separate fund, to be used for the purpose for which it had been raised, but Mr. Pasche, on behalf of the bank, agreed with Miss Smith that if the money were paid upon the notes, that the bank would let the grain company have it when it was ready to use it to move the buildings .from Valley Center to Wichita. This arrangement was later approved by Mr. Whiteley, and Mr. Hart was informed of it. All of the deposits of money from the sale of preferred stock were so shown upon the deposit slips, together with the name of the purchaser. The deposits were first made in the bank in the account of the grain company, and the grain company then gave its check for the full amount of the money received from the sale of preferred stock in payment upon its notes. These payments from the sale of preferred stock reduced the notes to the bank and loan company to about $21,000.. Later the bank did increase its loans to the grain company. Just what the increased loans were for is not shown, except that they were not for the purpose of enabling the grain company to move its mill from Valley Center to Wichita.

Plaintiff contends that the preferred stock was worthless when he bought it; that in the various trial balances of the grain company and statement prepared by it to obtain an increase of capital stock, the assets were listed at more than their actual value and the liabilities were listed at less than the real liability; that the real purpose of the bank and its officials was to have the grain company get money to be paid upon notes owed to the bank and the loan company; that the letter of the bank, used on the prospectus and relied upon, in part at least, by the plaintiff when he purchased the stock, contained misrepresentations of fact falsely made for the purpose of inducing persons to purchase stock.

Two quarterly dividends of $40 each were paid to plaintiff, and the bank was willing to furnish the money to pay the third dividend, but checks for that were never issued.

On April 13, 1921, the secretary of the grain company wrote plaintiff, inclosing a financial statement of the company for April 1, and called attention to the fact that the company was in a critical

financial condition. The statement showed the losses at that time
to be $25,770.75.

Before suit was brought, plaintiff's attorney presented a copy of
the original petition to the president of the bank, advised him of
plaintiff's contention that he had been induced by the letter of the
bank, signed by Mr. Tucker, to invest his money; that he claimed
the same was a fraud; that the bank had received the money and
retained it, and that he asked for its return, which was refused.

The suit was brought against the bank and the loan company and
against the principal officers of the bank and the officers and direc-
tors of the grain company. At the close of plaintiff's evidence the
court sustained a demurrer on behalf of all of the defendants except
the bank and S. C. Tucker. The appellees complain about that rul-
ing in this court sustaining the demurrer as to some of the defend-
ants, but since no cross-appeal was taken, the correctness of that
ruling will not be further considered. The appellants, the bank and
S. C. Tucker, contend that the demurrer should have been sustained
as to them.

It is argued on behalf of appellants that the letter contained
expressions of opinion only and not representations of fact. It is
conceded by appellants that since the representations were in writ-
ing it was proper for the court to construe the writing and say
whether it contained representations of fact or mere expressions
of opinion. (5 Wigmore on Evidence, 2d ed. § 2556; *Liggett v.
Bank*, 233 Mo. 590.) The court did rule upon that matter and held
the representations to be of fact. Appellants complain of that ruling
and say whether the account had been satisfactory to the bank and
to Mr. Tucker was a matter for them to pass upon, and that if they
so regarded it no one else can be heard to say it was not satisfactory.
In that connection we are cited to cases where by contract one is to
perform labor, to furnish evidence of title, or to sell goods or ma-
chinery that will be satisfactory to the other party, in which cases
it is frequently held that the other party has the option to say
whether or not he is satisfied. But this reasoning and this line of
cases is not applicable here, for the reason that this statement was
not made to influence the bank or Tucker, but was made for the
purpose of affording a basis for the action of the investing public.
The words, therefore, should be construed in their ordinary mean-
ing.

"Satisfactory" is defined as "giving or producing satisfaction,

yielding content, especially relieving the mind from doubt or un-
certainty and enabling it to rest with confidence." (35 Cyc. 794.)
"Giving or producing satisfaction, yielding content, especially re-
lieving the mind from doubt or uncertainty, sufficient; as, a satisfac-
tory account." (Webster's Dictionary.) And "very" is defined as
meaning "in a high degree, to no small extent, exceedingly, ex-
tremely." (Webster's Dictionary.) Hence these words in this let-
ter mean to the investing public that the account of the grain com-
pany with the bank had to a high degree produced satisfaction, re-
lieving the minds of the bank officials and of Mr. Tucker, its presi-
dent, from doubt or uncertainty.

It is something like the meaning of satisfactory when we speak
of satisfactory evidence, which is that evidence which ordinarily
produces moral certainty or conviction in an unprejudiced mind,
such as ordinarily satisfies an unprejudiced mind beyond a reason-
able doubt. (*Winston v. Burnell,* 44 Kan. 367, 369, 24 Pac. 477;
*State v. Trosper,* 41 Mont. 442; *Goltra v. Penland,* 45 Ore. 254;
*Brewer v. Doose,* [Tex.] 146 S. W. 323, 325.)

. This is not an ordinary letter of introduction such as was before
the court in *Bank v. Allen,* 92 Kan. 481, 141 Pac. 553 (and allied
cases), which contained no suggestion that the addressee should ad-
vance money upon the strength of it. This is a letter prepared,
designed and used to influence the investing public; to cause persons
with money to invest the same in the preferred stock of the grain
company by reason of the statements therein.

Appellants argue that the statement in the letter, "We believe that
funds invested in the securities of the company would be con-
servately placed where there are good possibilities for good profits,"
is obviously from its form and wording a mere expression of opinion
and not a representation of fact. But the form or wording of the
statement is not always controlling, especially when the writer pro-
fesses to have, and does in fact have, knowledge of the condition of
which he speaks superior to that of the person to whom it is ad-
dressed.

In *Reeves v. Corning,* 51 Fed. 774, 780, it was said:

"There is no certain rule of law by the application of which it can be de-
termined when false representations constitute matter of opinion or matter of
fact. Each case must, in large measure, be adjudged upon its own circum-
stances. In reaching its conclusions the court will take into consideration the
intelligence and situation of the parties, the general information and experi-
ence of the people as to the nature and use of the property, the habits and

Shriver v. National Bank *et al.*

methods of those dealing in or with it, and then determine, upon all the circumstances of the case, whether the representations ought to have been understood as affirmations of fact or as matters of opinion or judgment."

In 26 C. J. 1085 the rule is thus stated:

"Where the parties deal at arm's length with equal means of knowledge, the general rule that an expression of opinion is not actionable applies. But even an expression of opinion may constitute fraud where the relation of the parties is such that they do not deal upon equal terms and the speaker possesses superior knowledge of the subject, and this is especially true where the speaker expresses an opinion which he does not entertain and states it in positive terms relating to a matter susceptible of knowledge. Under such circumstances it may be said that the statement of opinion amounts to a false affirmation of fact, or to an implied assertion that the speaker knows facts justifying the opinion, and it is immaterial in which way the rule is expressed. In any event there is liability for the false affirmation of the fact that the opinion exists."

And at page 1086:

"Where the speaker has superior knowledge or means of knowledge and a relation of confidence exists, such that the speaker knows the hearer relies upon his statements as true, the speaker's expression of an opinion intended to deceive constitutes remediable fraud." (See, also, *Robbins v. Barton,* 50 Kan. 120, 126, 31 Pac. 686, and cases collected in the notes 35 L. R. A. 417 and L. R. A. 1915A 100.)

The statement is tantamount to saying that the writer, speaking for himself and other bank officials, represents as a fact that he believes (*i. e.,* that it is his judgment, based upon his intimate business relations with the grain company since its organization, a period of about four years, during which time the account of the grain company with the bank and the manner in which it was taken care of had been such as in a high degree to relieve the mind of the writer and other bank officials from doubt and uncertainty concerning it; the efficient management of the company, asserted as being known to the writer, as well as the high estimate of the ability and moral character of the men connected with it) that funds invested in the securities of the company would be conservatively placed (*i. e.,* safely placed, where there would not likely be innovation or radical change) with good possibilities for good profits. Force is added to this by an expression of willingness to give further information to anyone interested, naturally inferring that the more thoroughly one investigated the more thoroughly would he be convinced of the soundness of the company, its efficient management and the conservativeness of an investment in its securities.

It was not error for the court to hold that the letter contained representations of fact, which, if false and one was injured thereby, would sustain an action for damages, rather than mere expressions of opinion which would not form the basis of an action.

Appellants argue that their demurrer should have been sustained because of the insufficiency of the evidence to go to the jury in respect to the issues (*a*) of falsity of representations, (*b*) scienter, and (*c*) ratification by the bank of the unauthorized act. With respect to the falsity of representations, without again summarizing the evidence set out in the statement of the case herein, we think there was ample evidence to go to the jury on that question. Scienter, as the term is here used, means such knowledge as charges a man with the consequences of his acts. Generally, to constitute remedial fraud, misrepresentations must be made with scienter; that is, either with knowledge of their falsity or with culpable ignorance of their truth (26 C. J., 1105). Scienter may be established by showing actual knowledge of falsity, an assertion of actual knowledge coupled with ignorance of the truth, or a false statement made under special circumstances imposing a duty to know the truth (26 C. J., 1108). Generally it is held that fraud may be predicated upon a representation whether spoken with actual knowledge of its falsity or in reckless ignorance of the truth. (*Bank v. Hart,* 82 Kan. 398, 108 Pac. 818; *Rucker v. Allendorph,* 102 Kan. 771, 172 Pac. 524.) The evidence was sufficient to go to the jury on this question.

The trial court held that the writing of a letter, such as relied upon by plaintiff, is not a banking function and not within the implied authority of a bank president. There is no controversy over this holding. It is argued on behalf of the appellant bank that, even assuming the evidence sufficient to hold Tucker liable, the bank could not be held liable without showing a ratification by the bank of the unauthorized act of Tucker in writing the letter, and that the evidence on that question was not sufficient to go to the jury. We regard the evidence as sufficient, under the authority of *Abmeyer v. Bank,* 103 Kan. 356, 179 Pac. 368, and cases there cited.

Appellants complain of the following instruction of the court:

"If you find that the prospectus containing the Tucker letter, or a copy of it, was placed in a stamped envelope addressed to the Union Stock Yards National Bank and deposited in the United States mails, this creates the presumption that the letter was properly transmitted in the due course of the

mails to the bank, and was there received by the bank and its proper officers, and unless this presumption is rebutted by sufficient evidence to satisfy you that the prospectus containing the letter was not so-received by the bank, this would constitute notice to the bank of the Tucker letter and its contents and the fact that it was being used in connection with the sale of the preferred stock."

In 22 C. J. 96 the rule is thus stated:

"When a letter or other mail matter is properly addressed and mailed with postage prepaid, there is a rebuttable presumption of fact that it was received by the addressee as soon as it could have been transmitted to him in the ordinary course of the mails." (See, also, 21 R. C. L. 765, 769; *Fleming v. Evans,* 9 Kan. App. 858, 860; *Vancil v. Hagler,* 27 Kan. 407.)

We think the instruction was not misleading under these authorities.

The jury returned a general verdict in favor of plaintiff and against the defendant S. C. Tucker for $1,920 (which was for the $2,000 paid by plaintiff for the preferred stock, less $80 which he had received in dividends), and against the defendant bank for $2,318, being for same sum plus interest at six per cent from the time the bank received the money until the trial.

The appellant bank complains of the court's instruction on the matter of interest. As to S. C. Tucker, whom the evidence did not show received plaintiff's money, the court held the action to be an unliquidated claim for damages which would not draw interest before judgment. Complaint arguendo only is made as to that. As to the defendant bank, the court instructed the jury, in substance, that if they found against the bank, and that the bank received the money and knew of and ratified the fraud at the time it received the money, it would be liable for interest on the amount so received and retained from the date it was received. There was no error in this. (*Ellsworth v. Trinkle,* 96 Kan. 666, 153 Pac. 543.)

Complaint is made of the answers to special questions. It will not be necessary to examine them in detail. The alleged errors pointed out in them are not material.

The judgment of the court below will be affirmed.