No. 37,327

MERLE TOPINKA, *Appellee,* v. AMERICAN EAGLE FIRE INSURANCE
COMPANY OF NEW YORK, *Appellant.*

(205 P. 2d 991)

Opinion filed
May 7, 1949.

*Getto McDonald,* of Wichita, argued the cause, and *Glenn Porter, William Tinker, Arthur W. Skaer* and *Hugh P. Quinn,* all of Wichita, were with him on the briefs for the appellant.

*W. L. Cunningham,* of Arkansas City, argued the cause, and *Bert E. Church,* of Wellington, *D. Arthur Walker, Wm. E. Cunningham* and *William R. Howard,* all of Arkansas City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

ARN, J.: This action is one to set aside a release of defendant's liability under a hail insurance policy which Merle Topinka, plaintiff, alleged he signed because of fraudulent and false representations made to him by the defendant's adjusting agent in securing

the release, and for recovery of benefits alleged to be due plaintiff under the policy. The trial below was by a jury. Plaintiff prevailed and the defendant insurance company appealed specifying error of the trial court in overruling defendant's demurrer to plaintiff's evidence, in overruling defendant's objections to the court's instructions, and in overruling defendant's objections to plaintiff's evidence.

Plaintiff, a tenant, farmed 90 acres of land in Sumner county upon which he owned a two-thirds interest in a growing wheat crop. On April 18, 1947, he obtained from defendant insurance company a policy of insurance (maximum coverage $1,080) insuring the wheat crop against loss or damage by hail until the crop was harvested, but in no event later than August 15, 1947. A hailstorm swept through Sumner county on or about June 26, 1947, and damaged the wheat covered by the policy of insurance. Within forty-eight hours thereafter, as required by the policy, plaintiff made his claim by registered mail to defendant's Wichita office. On June 30, defendant's authorized agent and adjuster called upon plaintiff and proceeded to investigate plaintiff's claim of crop damage.

Both parties concede the existence of the policy, timely receipt of notice of loss and damage by hail, the negotiations between plaintiff and defendant's adjuster, and the provisions of the policy restricting its coverage to loss or damage caused solely by hail when such loss or damage equals five percent or more of the crop so damaged.

When the defendant's adjuster arrived at plaintiff's farm at about five o'clock on the evening of June 30, plaintiff accompanied him to the wheat field to examine plaintiff's loss. The usual procedure was followed of examining a proportionate number of the individual wheat straws and then determining the percentage of loss by striking an average from the wheat straws believed to be damaged by hail. Although there may be some conflict, there was ample evidence to the effect that a large percentage of the wheat was down and the straws bent and broken. The defendant's adjuster was apparently successful in convincing plaintiff that much of this damage and many of the broken wheat straws were caused by a condition which he called "crinkle joint" and which he said caused the affected plants or straws to bend or break at the "joint" or "node." The adjuster explained how wheat straws affected with

"crinkle joint" stand erect until a rain and then when wet they bend over or break at the joint, and that hail-injured plants seldom break at the joint. The adjuster did not count those straws he contended were affected with "crinkle joint." There was also substantial evidence that plaintiff believed defendant's adjuster, a graduate of the Agricultural College, to be an expert in these matters; that plaintiff had never heard of "crinkle joint" but he believed and relied on what the adjuster told him. There was some testimony by plaintiff that he never thought his wheat was affected by crinkle joint, but taken as a whole, plaintiff's own testimony and his evidence fairly established that the adjuster convinced him that most of his loss was due to crinkle joint, and that he relied upon the adjuster's statements. The adjuster also testifed that he expected plaintiff to believe and rely upon what he told plaintiff and he assumed plaintiff did so.

Plaintiff signed the hail-loss work sheet upon which the adjuster's computations were made, and plaintiff also signed the proof of loss. All other writing was by defendant's adjuster. There was some testimony concerning additions or corrections made by the adjuster after plaintiff's signature. In payment of the policy premium, plaintiff had given defendant his personal note. The proof of loss signed by plaintiff and the adjuster stated $36.96 as the amount of loss to be paid, and it bore a notation "credit on note $36.96." On or about August 8, plaintiff received a statement from the defendant for the balance due on the premium and immediately sent to defendant a money order for $17.57, which included fifty-three cents interest due defendant.

It should be added that the evidence adduced at the trial indicated the hailstorm on June 26 was quite severe; that the hail stones varied from the size of marbles to larger than hen's eggs; that cedar shingles on buildings were broken, gardens ruined, leaves stripped from trees, and the ground was white. The adjuster said he made no investigation of these conditions to determine the severity of the hailstorm, his only concern being the extent of hail damage to the wheat.

Plaintiff testified that he first learned in the latter part of August, 1947, that his wheat was not affected by "crinkle joint." He learned at that time by talking to neighbors, the county farm agent, the Triple-A chairman, and the officer in charge of the FHA in Sumner county, that there had been no wheat in Sumner county

affected by "crinkle joint." These officials themselves so testified. Upon obtaining this information, plaintiff visited his attorney. It was stipulated at the trial that on August 29 plaintiff's attorney made a written demand upon defendant for payment of the actual hail loss. This action followed, and as a result of which plaintiff obtained a judgment for $540.84 and for an attorney fee to be recovered and collected as part of the costs.

The first contention of the appellant insurance company is that the trial court erred in overruling defendant's demurrer to plaintiff's evidence because plaintiff's evidence was insufficient to set aside the release previously executed by defendant, and that plaintiff's evidence failed to prove all the elements of fraud necessary to set aside such release.

This is not quite the usual case of an insured suing to recover for his loss under the terms of an insurance policy. Here there is an additional feature in that a purported settlement was once negotiated, a purported release executed, and the plaintiff, claiming fraud in the settlement, now seeks to set aside the release. He also seeks recovery under the terms of the insurance policy. Of course the burden of proving fraud is upon the party alleging it—in this case, the plaintiff. It was therefore incumbent upon plaintiff to prove that the representation made to him by the adjuster, relative to "crinkle joint"—and not hail—being the cause of his crop loss, was false. (*Hicks v. Parker,* 148 Kan. 679, 681, 84 P. 2d 905; *Smith v. Webb,* 142 Kan. 230, 234, 46 P. 2d 618.) Plaintiff assumed that burden, and the demurrer challenges the sufficiency of the evidence to make that question one for the jury.

Both parties in their briefs discuss to some extent the term "scienter", *i. e.,* knowledge of the falsity of the statement by the party making it or his culpable ignorance and disregard for the truth of such statement when made. In the instant case the jury might well conclude, as it did, from all the circumstances and evidence, that the insurance adjuster's representation to plaintiff that his crop loss was due to "crinkle joint" rather than "hail" was made under circumstances imposing a duty to know the truth, and that they were made by the adjuster for the purpose of inducing the plaintiff to make a quick and nominal settlement of his crop loss by accepting the adjuster's statement as true. Be that as it may, was it necessary to plaintiff's recovery that plaintiff's evidence prove the adjuster knew his statements and representations about "crinkle joint"

were false? We think not. Whether made in good faith, or with fraudulent intent, or merely through over-anxiety to make a good settlement for his insurance company, the fact remains that the adjuster did make the representations with the intention and for the purpose of inducing plaintiff to make a settlement favorable to the insurance company and to part with all right to further recovery under his policy of insurance. Where the insurance adjuster's·false representations resulted in damage to the assured, the latter's pain of loss is not eased by the appellant's averments that the adjuster believed his statements to assured were true at the time they were made. False statements and misrepresentations of fact made by the insurance adjuster to the plaintiff for the purpose of inducing plaintiff to part with his property or property right, when relied upon by plaintiff, are actionable regardless of whether the adjuster knew his statements to be false or regardless of whether he made them in reckless disregard of their truth. (*Wickham v. Grant,* 28 Kan. 517; *Dodd v. Boles,* 137 Kan. 600, 21 P. 2d 364; *Westerman v. Corder,* 86 Kan. 239, 119 Pac. 868; *Bice v. Nelson,* 105 Kan. 23, 180 Pac. 206, 181 Pac. 558; *Becker v. McKinnie,* 106 Kan. 426, 186 Pac. 496; *Pellette v. Mann,* 116 Kan. 16, 225 Pac. 1067; *Bank v. Hart,* 82 Kan. 398, 108 Pac. 818; *Nelson v. Healey,* 151 Kan. 512, 99 P. 2d 795; *Kurt v. Cox,* 101 Kan. 54, 57, 165 Pac. 827.)

Plaintiff did not have the burden of proving that the insurance adjuster knew his statement was false when he convinced plaintiff that his wheat crop loss was caused principally by "crinkle joint" and not by hail. See Black on Rescission and Cancellation (2d ed.), sec. 102, pp. 300-303:

"Where one induces another to enter into a contract with him by the positive assertion of a fact or state of facts, material to the transaction, which do not really exist, and the other relies thereon, and is misled to his injury, the view of equity is that it would be unconscionable to permit the party making the assertion to retain the fruits of the bargain, which he has thus secured, and therefore he must be held liable as for a species of constructive fraud, *even though he may not have known that his statement was false.* He is bound at his own peril to know the truth of the matter of which he speaks, and *the inquiry is not whether he knew the representation to be false, but whether the other party believed it to be true, and was misled by it in entering into the contract.* Hence, we have the well-settled rule in equity that when rescission of a contract, deed, or other transaction is sought on the ground of misrepresentation of material matters of fact, believed in and acted upon by the party seeking relief, and resulting in his injury or prejudice, *it is not necessary to show that the party making the representations knew them to be false, but he will be held responsible for their falsity, though he*

*spoke without knowing anything about the matter, though he himself was misinformed and mistaken, and even though he actually believed in the truth of what he affirmed.* A person may be guilty of fraud by stating that he knows a thing to be so, when he only believes it to be so. A representation of a fact, as of the party's own knowledge, and which proves false, is, unless explained, inferred to be willfully false and made with an intent to deceive at least in respect to the knowledge professed. This rule has been stated with careful precision by the Supreme Court of Wisconsin as follows: If one in negotiating with another in contractual matters makes a misrepresentation of fact, material to the transaction, to induce the other to act thereon, and such other reasonably does so act, to his prejudice, he may avoid the result on the ground of fraud, actual or constructive, and may have the aid of equity to that end, and it is not a sufficient answer to his claim for the person making the representation to say that he did so honestly, since it is his duty to know whereof he speaks, or not to speak at all as of his knowledge." (Italics supplied.)

Appellant also points out that plaintiff's petition alleged: "Said statement of defendant's agent [the adjuster] was false and untrue, and *known by the defendant to be false and untrue.* . . ." It does not follow that plaintiff must prove this and every allegation merely because they were alleged in his petition. Plaintiffs' petitions often allege more than can be proved or more than they are required to prove—and such "overpleading" is not detrimental to the plaintiff's case.

The adjuster testified that he expected plaintiff to rely upon his statements about "crinkle joint" and assumed that plaintiff did rely upon them. Plaintiff testified he did believe the statements made by the adjuster and continued to believe them until the latter part of August when he learned that "crinkle joint" had not been the cause of his crop loss; that he trusted the adjuster's judgment and statements and relied upon them in making the purported settlement of June 30. Upon this entire question of fraud, then, the real factual dispute was as to the truth or falsity of the adjuster's statements about "crinkle joint" being the cause of plaintiff's crop damage. As heretofore stated, there was sufficient evidence to take this question to the jury (*Gabel v. Hanby,* 165 Kan. 116, syl. ¶ 1, 193 P. 2d 239), and a special question upon this specific point was submitted to the jury and a finding made as follows:

"Q. If you find for the Plaintiff, state the false and fraudulent statements made by Henry O. Cronkite to the Plaintiff. A. Henry O. Cronkite said that wheat was destroyed by 'crinkle joint.' "

The demurrer to plaintiff's evidence was properly overruled.

Appellant's next specification of error is that the trial court gave erroneous instructions to the jury. It is contended that instructions 7, 8 and 9 were misstatements of the law in that they did not charge plaintiff with the burden of proving that the insurance adjuster's representations were known by him to be false; and Instruction No. 9 is objected to because it specifically charged that it was immaterial whether the defendant's insurance adjuster knew his representations were false at the time they were made. Instructions Nos. 8 and 9 are as follows:

"You are further instructed that if you find from the evidence and by a preponderance thereof, that defendant's agent and adjuster went to the plaintiff's premises for the purpose of examining and adjusting the loss suffered by the plaintiff by reason of a hail storm which occurred on the 26th day of June, 1947, and that, after examining the wheat in the condition in which it then was, defendant's agent and adjuster, for the purpose of securing the signature of the plaintiff, Topinka, to certain written documents, designated as a 'Hail Loss Work Sheet' and a 'Hail Adjustment Proof of Loss,' did represent and pretend to the plaintiff that he, the adjuster, was an expert in the matter of diseases affecting wheat and was able to determine by examination of wheat what, if anything, was the matter with it, and did state to the plaintiff that plaintiff's wheat had suffered but slight damage by reason of hail and that all the rest of the damage to plaintiff's wheat was caused by what is known as 'crinkle joint' and the plaintiff then and there, stated to defendant's agent, in substance, that he did not know what was or was not 'crinkle joint,' and would be compelled to rely on the statement of the adjuster, and said adjuster assured the plaintiff that his major damage was the result of 'crinkle joint'; and you further find from the evidence of the whole case and by a preponderance of the same, that the statements so made by defendant's agent and adjuster were not true but false; and that the plaintiff believed and relied upon such statements, and so believing and relying, did sign the written documents mentioned whereby he did settle with and release the insurance company from liability to the plaintiff for his crop loss by hail damage, then you should find that said documents are of no force or effect and wholly invalid, and your verdict should be for the plaintiff.

"On the other hand, if you shall fail to find from the evidence that defendant's agent and adjuster made such representations or that if such representations were made and the same were true; or if you shall find that said statements and representations were made and were false but the plaintiff did not believe such false statements and did not rely on them so that no undue advantage was taken of him in his execution of said written documents, then the plaintiff would be bound by his transactions as set forth therein and your verdict should be for the defendant.

"You are further instructed that if you find from the evidence and by a preponderance thereof, that the defendant's agent and adjuster made, as a positive representation of fact, the representations and statements as alleged and claimed by the plaintiff in his petition and reply relative to the cause of

the injury to plaintiff's crop of wheat and the liability of the insuring company in connection therewith, intending thereby to induce the plaintiff, Topinka, to sign the 'Hail Loss Work Sheet' and the 'Hail Adjustment Proof of Loss' as claimed by the plaintiff, and that the plaintiff, Topinka, relied upon and believed such representations and statements to be true and was thereby induced to sign his name to these written documents, and that said statements and representations were, in fact, not true, then I charge you that it is not material whether the defendant's agent knew his representations were false at the time they were made or not, if you find they were so made, but the making of such false representations would constitute fraud just the same as though the adjuster had known them to be false at the time they were made; and the act of the plaintiff in executing said written instruments would be of no effect."

This proposition of law has been heretofore discussed in this opinion, and the cases cited in connection with that discussion lend approval and support to the statements of law contained in the instructions which are challenged here. Another decision of this court not included among the authorities above cited is the case of *Sluss v. Brown-Crummer Inv. Co.,* 143 Kan. 14, 53 P. 2d 900, where we said:

"The next error of which defendant complains is the giving of instruction number 27. It was as follows: 'Damages caused by a representation false in fact, may be recovered, if made to induce the damaged person to part with his money, even when such representation is made without actual knowledge of its truth or falsity, provided, of course the person to whom such representations or statements are made believed the same and relied thereon.' This instruction is in accordance with the holding of this court in *Pellette v. Mann,* 116 Kan. 16, 225 Pac. 1067, and *Roome v. Petroleum Co.,* 111 Kan. 633, 208 Pac. 255. 'We still adhere to what was said there." (p. 24.)

Appellant relies heavily upon the cases of *Roome v. Petroleum Co.,* 111 Kan. 633, 208 Pac. 255, and *Shriver v. National Bank, et al.,* 117 Kan. 638, 232 Pac. 1062. In the former case the trial court gave an instruction as to the necessary elements of fraud and included therein the statement that the false representation when made must have been known to be false by the party making it. On appeal this court approved the trial court's statement of the elements of actionable fraud, but did so without particularly stressing the fact that the party making the representation must have known it to be false. The other instructions in the Roome case were disapproved by this court because they charged that fraud could be predicated only upon a dishonest motive. This court said:

"False representations, if they result in damage to the person to whom they are made, are injurious whether made through honest or dishonest motives,

and the damage sustained can be recovered if the representations are made with the intention of inducing the injured person to part with his money or property." (p. 635.)

Furthermore, the Roome case quotes with approval from *Bice v. Nelson,* supra, as follows:

"In this state, false statements of fact, made by a seller to induce a sale and relied on by the buyer, are actionable, without regard to whether or not the seller knew the statements to be false, or acted recklessly in making them, or intended to deceive." (p. 636.)

We then said, in conclusion:

"There was abundant evidence to show that the representation was not true. The instructions of the court were misleading." (p. 636.)

In the other case we mentioned as having been stressed by appellant, *Shriver v. National Bank, et al.,* this court discussed the principle of scienter, saying:

"Scienter, as the term is here used, means such knowledge as charges a man with the consequences of his acts. Generally, to constitute remedial fraud, misrepresentations must be made with scienter; that is either with knowledge of their falsity or with culpable ignorance of their truth (26 C. J. 1105). Scienter may be established by showing actual knowledge of falsity, an assertion of actual knowledge coupled with ignorance of the truth, *or a false statement made under special circumstances imposing a duty to know the truth* (26 C. J. 1108)." (Emphasis supplied.) (p. 648.)

It appears that appellant places too much emphasis upon the Roome and Shriver opinions, for we are unable to construe either of them as authority that false representations must have been known to be false by the person making them before the fraud can be actionable. That is not the law in this state as indicated by those opinions as well as the many other authorities herein cited. We fail to find where this court has ever held, under such circumstances as we have here, that to establish fraud there must be proof that the fraudulent representation was made with knowledge of its falsity on the part of the party making it. Such a rule would too likely defeat the administration of justice. There was no error in the trial court's instructions.

The third specification of error, although not briefed or argued by appellant, is that the trial court erred in overruling objections made by defendant to plaintiff's evidence. However, we have examined the record before us and fail to find any error in this respect.

The judgment of the trial court is affirmed.

HARVEY, C. J. not participating.