No. 49,142

KIRK L. DUSHANE, JR., *et al., Appellees and Cross-Appellants,* v. UNION NATIONAL BANK, *Appellant and Cross-Appellee.*

(576 P.2d 674)

Opinion filed April 1, 1978.

*Emmet A. Blaes,* of Jochems, Sargent & Blaes, of Wichita, argued the cause, and *Robert L. Heath,* of the same firm, was with him on the briefs for the appellant and cross-appellee.

*C. Robert Bell,* of Brick & Bell, of Wichita, argued the cause, and *Gary M. Austerman,* of the same firm, was with him on the brief for the appellees and cross-appellants.

The opinion of the court was delivered by

FROMME, J.: The defendant, Union National Bank of Wichita, appeals from fraud judgments totaling $304,363.14. These judgments were entered in favor of Kirk L. DuShane, Jr., and eight other individual plaintiffs. Two other plaintiffs, whose claims were dismissed by the court prior to trial for failure to appear in person, have cross-appealed.

General background information will be helpful in understanding the question presented on appeal. The claims of fraud arose out of individual purchases of shares in working interests in oil and gas leases promoted by Albert J. Gebert. Gebert had been in the oil business in Kansas for many years. He had promoted and completed many oil and gas wells and was well known in the

Wichita area. Gebert had bank accounts in both the Fourth National and the Union National Bank in Wichita. Union National had been extending credit to Gebert on wells when oil was found in commercial quantities. Its principal loans to Gebert were secured by a mortgage on producing wells. In August, 1971, Gebert closed out the last of his three checking accounts with Union National. Union National continued to carry a consolidated loan, which was being paid from oil production, and one $10,000.00 note which had been guaranteed by Gebert's father and brother.

Sometime in 1971, Gebert met with plaintiff, Kirk L. DuShane, Jr., while in California, and they discussed investments and financing of future oil ventures in Kansas. In January or February, 1972, Gebert moved to California.

DuShane became sufficiently interested in Gebert's oil operations that he considered investing and interesting others in investing in these ventures. After giving Gebert a check for $2,000.00, DuShane decided to make inquiry as to Gebert's credibility and his general credit standing. On April 18, 1972, DuShane called long-distance from California and talked with Phillip C. Rader, a vice-president of the Union National Bank of Wichita. We will relate the substance of this conversation later but suffice it to say DuShane received favorable comments from Rader as to Gebert's credit and his general ability as an oil finder. DuShane also called another bank in Wichita and received favorable comments on Gebert's general ability as an oil finder.

Thereafter DuShane began talking with some of his friends and business acquaintances and between July, 1972, and April, 1973, DuShane and his business acquaintances invested considerable sums in working interests in Gebert's oil ventures. Some of these investments were in producing oil wells and some in wildcat drilling ventures. On each of the investments made by his business acquaintances DuShane received a commission from Gebert for arranging the sales. None of the money was deposited in the Union National and none was used to pay Gebert's indebtedness to the bank.

The investors began to experience some difficulty with Gebert as early as January, 1973. Checks issued by Gebert on a California bank representing the investor's shares in oil production were protested for insufficient funds. Assignments of oil interests made

to some of the investors were found to be invalid. It appears that some of the interests owned by Gebert in Kansas oil leases had been oversold.

In August, 1974, one of the investors sued and obtained a judgment against Gebert in California. The other ten investors sued and obtained judgments against Gebert in the United States District Court in Kansas. Apparently these judgments were not collectible. Some of the Gebert leases had not been drilled within the proper time and had expired, so the working interests held by the investors in these leases terminated. Those leases on which there was production were apparently sold to satisfy secured debts of Gebert. At least one of the investors, Robert J. Miller, received $3,646.00 in oil runs from H-30 Inc., an oil company which purchased and took over some of Gebert's producing wells. At least eight of the nine investors who obtained the judgments below testified they received some income from their investments.

In April, 1975, DuShane and ten of the investors filed the present action alleging fraud on the part of the Union National Bank. The case was tried to the court and the judgments from which the present appeal was taken were entered.

The petition of the plaintiffs alleges the following facts in support of fraud:

"3. During the first part of 1972, DuShane was contacted by Albert J. Gebert, who represented that he was engaged in the business of selling interest in oil and gas ventures. Gebert advised DuShane that, if he desired any information concerning Gebert, he should contact Defendant.

"4. Shortly after the events mentioned in paragraph No. 3 hereof, DuShane conferred with Mr. Phillip Rader, the executive vicepresident of the Defendant, and was told that Albert J. Gebert was a good oil finder, had been a satisfactory customer of the Union National Bank since 1960, had a drilling company in financial problems with large credit but hung in there and worked it out, had lots of financing of substantial amounts, was No. 1 finder of new productions, was honest and of great integrity and was not a pipe setter.

"5. Relying upon the information furnished by Defendant to DuShane, each of the Plaintiffs paid the following shown amounts to Gebert, allegedly for the purchase of interests in oil and gas drilling ventures: [The plaintiffs are then named and various dollar amounts are listed opposite their respective names.]

"6. During the latter part of April of 1973, Plaintiffs learned that the information furnished by Bank to DuShane, as alleged in Paragraph No. 4 hereof, was inaccurate, untrue, misleading, and false, in that in truth and in fact at the time of the said conversation, the defendant's officer, Mr. Rader, knew or should have known that the loans by the bank to Albert J. Gebert were in serious trouble and

there was considerable doubt about their eventual collectability and the failure of defendant's officer to convey such information along with the information which was conveyed to DuShane who conveyed such information to each of the other plaintiffs before they entered into any agreements with Gebert or paid Gebert any money seriously misleading all of said plaintiffs to their damage."

The principal plaintiff, DuShane, testified at the trial as to the statements of Rader on which the allegations of fraud were predicated:

"I telephoned Mr. Rader on April 18, 1972. Mr. Rader indicated at that time that Mr. Gebert was a good oil finder and had led the state in exploration discoveries during one or two prior years; that he had been a customer of the bank since 1960 and explained to me that in prior years Mr. Gebert had been with a drilling company that had financial problems with credit with the bank involved, and said Jay had hung in there and worked out the problems even after the credit situation had been in great difficulty. He told me there had been lots of financing with Jay, primarily completion costs on successful exploration and wildcat drilling, and that he was the number one oil finder for new production in the state of Kansas; that he was honest, with great integrity and not a pipe setter; that he had available credit for additional loans to Mr. Gebert for completion of wells."

The remaining plaintiffs testified they had no contact with Union National but relied on the statements relayed to them by DuShane.

The trial court's findings of fact bearing on fraud, which we accept as being supported by the evidence, were:

"At the time of the conversation above referred to, Phillip Rader was an Executive Vice-President of the Union National Bank. He had extensive specific knowledge of the bank's transactions with Albert J. Gebert, III; and among his duties was the duty to answer questions with respect to credit standing of customers of the bank.

"The balance of the conversation is in substance as follows:

"That Mr. Gebert had a satisfactory credit reputation with the bank; that he was a good oil finder, and man of great integrity.

"On that date Mr. Gebert was in default on a $10,000.00 unsecured note at the bank. The bank had been required to charge to bad debts approximately $30,000.00 of another large loan in the amount of $146,421.00. In addition, Mr. Gebert had not fulfilled his previous promise to the bank with respect to the security for the loan. The loan was secured by assignments of the oil production runs from working interests in oil and gas properties. Mr. Gebert had promised the bank to pay the operating expenses from other funds, and over a period of many months he had failed to do so and the bank had been required to pay operating expenses. The bank was in the possession of a financial statement of Albert J. Gebert, which is a part of Plaintiff's Exhibit 3. It is dated March 23rd, 1971, and without any question it shows that Albert J. Gebert had a negative net worth of $42,000.00. Information in the bank's files also disclosed that Mr. Gebert's chief source of income was promoting oil and gas ventures from which

he expected to realize a profit. Virtually all of his working interests were assigned as security for loans. The bank eventually foreclosed the large loan, after advances in crude oil prices of a considerable amount, and suffered no loss as a result of the loan and most likely recovered their charge-off of $30,000.00.

"All of the above facts were within the specific knowledge of Phillip Rader at the time he had the conversation with Mr. DuShane."

As a basis for fraud to support these judgments the court concluded:

"The bank is obligated, once it undertakes to answer credit questions to make a full, complete and truthful disclosure.

"The Court concludes that three material facts with respect to the financial status of Albert Gebert were concealed in the conversation with Mr. DuShane by Mr. Rader on April 18th, 1972. First, the large loan of $146,000.00 had been larger at which time it was deemed inadequately secured by bank examiners. Second, Albert Gebert had not kept his promise to pay operating costs on the oil and gas working interests which secured the large loan from other funds. Third, the unsecured loan of $10,000.00 was in default and its collectability did not depend in any way on the financial ability of Albert Gebert, but was cosigned by financially responsible third parties."

The appellant bank contends the plaintiffs' evidence wholly failed to establish actionable fraud. This court agrees.

Actionable fraud may be based upon false representations made as to existing and material fact (*Broberg v. Boling,* 183 Kan. 627, 634, 331 P.2d 570 [1958]) or upon a suppression of facts which the party is under a legal or equitable obligation to communicate and in respect of which he could not be innocently silent (*Wolf v. Brungardt,* 215 Kan. 272, Syl. ¶ 4, 524 P.2d 726 [1974]). As to fraud based upon false representations see *Sipes v. Crum,* 204 Kan. 591, Syl. ¶ 2, 464 P.2d 1 (1970); *Minnesota Avenue, Inc. v. Automatic Packagers, Inc.,* 211 Kan. 461, 466, 507 P.2d 268 (1973); and PIK 2d (Civil) 14.40 and cases cited in the comment therein.

The trial court did not base its judgment in this case upon false representations made as to existing material facts. It concluded the officer of the bank concealed three material facts with respect to the financial status of Albert J. Gebert, *i.e.,* (1) The large loan of $146,000.00 had been deemed inadequately secured by bank examiners, (2) Gebert had not kept his promise to pay operating costs on the oil and gas working interests which secured the large loan, and (3) the unsecured loan of $10,000.00 was in default but cosigned by financially responsible third parties.

Accordingly, our consideration of the judgments rendered by

the trial court in this case must be based upon the law governing actionable fraud based upon concealment or suppression of facts. A suppression or concealment of the truth is not at all times such fraud or deceit as will be relieved against. It must be a suppression or concealment of facts which the party is under a legal or equitable obligation to communicate and in respect of which he could not be innocently silent. (*Star Ins. Co. v. Carey,* 126 Kan. 205, 267 Pac. 990 [1928]; 37 Am. Jur. 2d, Fraud and Deceit, § 144, p. 198.)

The question of what gives rise to a legal or equitable obligation to communicate is not always an easy question to resolve, but generally the duty must arise from a relationship existing between the parties when the suppression or concealment is alleged to have occurred. It may arise between two contracting parties when there is a disparity of bargaining powers or of expertise as in *Anderson v. Heasley,* 95 Kan. 572, 148 Pac. 738 (1915). In *Anderson* a young Swedish farmer was permitted an action against an experienced businessman on the basis, in part, of certain statements which in another context might well have been considered puffing or sales talk. See also *Elerick v. Reid,* 54 Kan. 579, 38 Pac. 814 (1895); *Morrow v. Bonebrake,* 84 Kan. 724, 115 Pac. 585 (1911); *Williams v. Hanna,* 105 Kan. 540, 185 Pac. 17 (1919); *Fourth Nat'l Bank v. Webb,* 131 Kan. 167, 290 Pac. 1, 71 A.L.R. 619 (1930); *Sluss v. Brown-Crummer Inv. Co.,* 143 Kan. 14, 53 P.2d 900 (1936).

If the parties to a bargain are in a fiduciary relationship to one another a similar protection has generally been afforded. (*Merchant v. Foreman,* 182 Kan. 550, 322 P.2d 740 [1958]. See also *Campbell v. Gooch,* 131 Kan. 456, 292 Pac. 752 [1930].)

In the present case the communication was not between contracting parties, and there was no fiduciary relationship between the Union National and DuShane.

The record discloses that DuShane formerly had been employed by Security Pacific National Bank in Los Angeles. At that bank he had been branch manager, had progressed until he handled credit inquiries and later was promoted to the industrial loan department. Prior to his service with the bank he had worked five years for McCormick Oil and Gas Company of Houston, Texas.

DuShane testified: "As far as information contained in the

bank's files, plaintiffs' Exhibits 1 through 4, as a former bank officer, I wouldn't expect to have access to this information. This information is confidential between the bank and its customer in many cases." Exhibits 1 through 4 were the bank records showing the condition of both the $146,000.00 secured loan, and the $10,000.00 note cosigned by responsible third parties. The inquiry by DuShane was not in the course of any business between him and the Union National Bank. It did not concern a possible purchase of any specific oil and gas interest of Gebert on which the bank held a past due mortgage.

Where a plaintiff and defendant are not bargaining with each other and the defendant obtains no advantage from suppressing or concealing information about a third party the law has generally absolved the defendant of liability unless he has made a statement which induced the plaintiff to act, knowing that the statement was false or at least making it recklessly. (*Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 [1931].) See also *Texas Tunneling Company v. City of Chattanooga, Tenn.,* 204 F. Supp. 821 (E.D. Tenn. 1962) which was reversed in part, 329 F.2d 402 (6th Cir. 1964), on the grounds a defendant could not be made liable to third parties for negligent statements unless their identities were known.

In 37 Am. Jur. 2d, Fraud and Deceit, § 137, p. 187, it is said:

"It is well settled that where the other requisite elements of actionable fraud are present, false and fraudulent representations made to one contemplating business transactions or negotiations with a third person, concerning the financial status, solvency, or credit of such third person, constitute misrepresentations which may form the basis for actionable fraud. While one of whom inquiries as to the financial standing or reputation of a third person are made has his option to answer or not and may refuse to give any information on the subject, yet if he undertakes to do so, he must answer according to the truth as far as he knows. . . ."

In an article in 9 Washburn Law Journal 315, "Some Observations on the Law of Misrepresentation in Kansas," James R. Ahrens, Professor of Law, Washburn University School of Law, states:

"Conscious knowledge that one does not know the facts should be distinguished from situations in which the maker of a statement has misstated a fact but believes it to be accurate even though this belief is unreasonable. Such statements should be characterized as being negligently made. Negligence in making a statement is often treated differently than intentionally or recklessly falsifying the facts. . . ." (pp. 322-323.)

In the case under consideration the trial court quite properly refused to find evidence of fraud based upon false representations made as to existing and material fact. Rader advised DuShane that Gebert was a good oil finder and had been a leader in exploration discoveries. Two newspaper articles appearing in the oil news in 1967 and 1969 were introduced in evidence. One article stated that the company which Gebert had operated had been third in wildcat discoveries in Kansas for the second consecutive year. The other article referred to Gebert's firm as one of the most active and successful firms in oil exploration. DuShane testified that he had called the Fourth National Bank in Wichita on the same date he talked to Rader, and received similar information as to Gebert's past successes.

DuShane further testified he was advised by Rader of Gebert's financial difficulties which Gebert had worked out with the bank. This too was correct information. Such information was not such as would indicate misrepresentation intended for some ulterior motive. Rader also stated that the bank had had "lots of financing with Jay [Gebert], primarily completion costs on successful exploration and wildcat drilling." This statement was true. The bank's secured loan records, which were introduced in evidence, indicated loans from the bank on January 25, 1972, totaled $176,253.33, including the $30,000.00 charged off at the request of the bank examiner. At the time of DuShane's inquiry on April 18, 1972, this balance had been reduced to $166,421.98 from the receipts of the oil runs. By April 11, 1975, when the present action was filed, the balance due was $85,700.30, and later that year the security was foreclosed and the bank received the entire balance due on its loan. The $10,000.00 note which was outstanding at the time DuShane called Rader was paid in full within ten days after the call from DuShane.

The only other statement made by Rader to DuShane was that Gebert was honest and with great integrity. These are purely matters of opinion, and were based upon the bank's past experiences with Gebert. It cannot be said the statements were knowingly false or made in reckless disregard of the truth.

We have examined the Kansas cases cited in support of these judgments and based upon the theory of suppression or concealment of facts. They are not persuasive.

In *Shriver v. National Bank et al.,* 117 Kan. 638, 232 Pac. 1062

(1925), the plaintiff was induced to buy worthless stock of a grain company. The principal assets of the grain company had been purchased on a contract held in escrow at the defendant bank. The grain company owed a rather large sum to the bank and overdrafts on the bank were frequent and ran as high as $8,000.00. The balance sheet of the grain company showed a loss of $10,000.00. The company decided to issue additional stock and move to another city. The last page of the prospectus on which the plaintiff relied when he purchased stock contained a letter from the defendant bank addressed: "To whom it may concern." The letter stated the bank had carried the grain company account for many years. The account had always been very satisfactory and well taken care of. The letter went on to state the company was efficiently managed and the men behind the business were of good personal ability and moral character. The letter closed with the statement, "We believe that funds invested in the securities of the company would be conservatively placed where there are good possibilities for good profit." This court affirmed judgments against both the bank and its president.

In *Shriver* the bank did have a business relationship with the company selling the stock. The money received on the sale of the stock was deposited in the bank and used to shore up the finances of its customer. The letter attached to the prospectus was for the direct purpose of promoting a sale of stock in a company which the bank knew was in financial trouble. In providing this letter to be attached to the prospectus the bank was under a duty to those interested in purchasing the stock to make true statements. The factual differences between *Shriver* and the present case are obvious. In *Shriver* the statements were false, they were made for the purpose of promoting the sale of a particular stock and the money obtained from such a sale went into the bank to bolster the financial condition of its customer, who was in debt to the bank beyond its ability to pay the amounts owed to the bank.

The case of *Shriver v. Fourth Nat'l Bank,* 121 Kan. 388, 247 Pac. 443 (1926), is almost identical to the prior *Shriver* case except the court sustained a demurrer to plaintiff's evidence since there was no evidence introduced to establish that statements in the prospectus letter were false.

Our attention has been called to various cases of fraud occurring between contracting parties such as *Morrow v. Bonebrake,*

supra. Such cases are not applicable to the facts of our present case where fraud is claimed against a third party.

In *Sparks v. Guaranty State Bank,* 179 Kan. 236, 293 P.2d 1017 (1956), and 182 Kan. 165, 318 P.2d 1062 (1957), the false and fraudulent representations made by the officer of the bank concerned a check protested by the bank and never paid. The officer's false representations induced the payee to forego self-help in repossessing 225 cases of eggs for which the check was given. The bank official assured the plaintiff that the maker of the check was not in financial difficulty and was solvent; that there was no doubt he would be paid the amount of the protested check within a week or two; and that the check was the first given by the maker which the bank had protested. The official persuaded the payee to leave the check with the bank for collection, and as a result the payee lost not only the eggs but the amount of the check.

In *Sparks* the jury in answer to special questions found the officer made false statements, did so knowingly, and concealed the true financial condition of the drawer of the check. In *Sparks* there was not only concealment with regard to a matter about which the bank had a duty to disclose information but also false statements about existing material fact, known to be false and made for the purpose of inducing the party to forego action then available to mitigate his damage. There could be no question of the payee's reliance upon the false representations. The case is not persuasive as to defendant's liability in the present case.

The final case we will examine is *Wolf v. Brungardt,* supra. In *Wolf* the bank was interested in assisting one of its credit customers to obtain additional capital for an electronic sales business. The fraud upheld in *Wolf* involved not only a fiduciary relationship between two partners in a business where one had superior knowledge and expertise but also a false representation by the bank officer to the effect that he was going to invest his own personal funds in the business. The bank officer did not invest. The involvement of the bank and its officer in the particular business exceeded $33,000.00 in credit extended for the purchase of business inventory. The funds received from Wolf in purchasing an interest in the business were paid through the bank and applied against the amount of the business indebtedness outstanding. Neither the bank nor the former owner of the business disclosed the amount of the outstanding indebtedness to the nineteen-year-old purchaser or to his mother, Anna Wolf.

In *Wolf* there was a substantial credit interest by the bank in a particular business being purchased. In addition to concealment of the financial condition of the business there was a false statement knowingly made by the bank officer that he was going to invest some of his personal funds. There was a disparity of business acumen between the nineteen-year-old boy and those who were pressing for the boy's purchase of an interest in the business. The case is not persuasive.

We hold the evidence introduced in the present case fails to establish actionable fraud against the bank. The bank was under no legal or equitable obligation to communicate to DuShane any of the three items of information on which the trial court found fraudulent concealment. As was acknowledged by DuShane when he testified, this information was confidential between the bank and its customer Gebert. Having reached this conclusion the remaining points on appeal are moot.

Accordingly the case is reversed on appeal and affirmed on the cross-appeal.

HOLMES, J., not participating.