No. 27,916.

The Star Insurance Company of America, *Appellant*, v. H. J. Carey, *Appellee.*

No. 27,917.

The California Insurance Company of San Francisco, California, *Appellant*, v. H. J. Carey, *Appellee.*

(267 Pac. 990.)

Opinion filed June 9, 1928.

*Robert Stone, Geo. T. McDermott, James A. McClure, Robert L. Webb, Beryl R. Johnson,* all of Topeka, *F. Dumont Smith, Eustace Smith* and *Arthur T. Symns,* all of Hutchinson, for the appellants.

*C. M. Williams, D. C. Martindell* and *W. D. P. Carey,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: These cases, which were consolidated for trial, were actions to recover on separate bonds executed by the defendant H. J. Carey, to insure the fidelity of the late Claude B. Carey, of Hutchinson, in his capacity as local soliciting and recording agent for the plaintiff insurance companies. The agent died about two months after the bonds were given, at which time he was in arrears in his remittances to plaintiffs for insurance premiums collected by him for insurance policies issued to various persons through the local agency of Claude B. Carey.

Typical of both petitions was that of the Star Insurance Company, which alleged that on February 9, 1922, Claude B. Carey was its local recording agent in Hutchinson; that it was his duty to solicit the writing of insurance and to collect premiums thereon; that on February 9, 1922, Claude B. Carey as principal and this defendant H. B. Carey as surety entered into an undertaking with plaintiff whereby they bound themselves to pay all premium moneys due plaintiff which Claude B. Carey should collect on its behalf and that he would well and truly perform all his duties as plaintiff's agent. The fact of Claude B. Carey's death in April, 1922, was pleaded; and it was alleged that between February 9, 1922, and the time of his death two months later he effected the writing of insurance policies and collected premiums thereon for which he had made no remittance to the extent that he was indebted to plaintiff in the sum of $1,087.75. Plaintiff also alleged that in due time its claim for this sum was presented to the administrator of Claude B. Carey's estate, but it was not paid because the estate was insolvent. Wherefore plaintiff prayed judgment against H. B. Carey, surety on the fidelity bond.

Defendant answered, admitting the matters not fairly susceptible of controversy; and alleged that prior to February 9, 1922, the date of the execution of the fidelity bond sued on, Claude B. Carey had written policies of insurance for which he had failed to remit to the plaintiff its proportionate share of the premiums, and that he was in default thereof at the time the bond was executed. Defendant alleged that the plaintiff's representative came to Hutchinson and required Claude B. Carey to give bond for the future collection of premiums and the proper management of his recording agency; that defendant was induced to sign the bond; and that plaintiff's repre-

sentative and Claude B. Carey canceled outstanding policies and issued new ones, giving credit to the policyholders for the unearned premiums and collecting premiums for the terms specified in the new policies; and that the purpose of these cancellations and renewals was to make it appear that the defendant surety was liable for the defalcations of Claude B. Carey which had occurred prior to the giving of the bond.

After issues were joined, but before the trial, defendant was permitted to amend his answer by interlineation thus:

"That the effect of such transactions was to carry forward the defalcations to a time after the execution of said bond, thus fraudulently making said Howard J. Carey liable for said prior defalcations of said Claude Carey."

After the trial another amendment to defendant's answer was permitted:

"That by reason of concealing from the said H. J. Carey, and withholding from the said H. J. Carey, information of the previous defalcations of the said Claude B. Carey, [no concealment or withholding pleaded] this defendant was defrauded into signing said bond; the said H. J. Carey having no knowledge of said previous defalcations of said Claude B. Carey."

At the trial the plaintiffs established· their *prima facie* actions along the lines pleaded in their petitions. On behalf of defendant the testimony was that prior to February 9, 1922, Claude B. Carey had collected various sums as premiums for which he had made no remittances, and that he was delinquent in the sum of $1,506.84 due the Star Insurance Company. A similar delinquency of $428.66 due the California Insurance Company was likewise shown. After the giving of the bond sued on, February 9, 1922, Claude B. Carey collected certain premiums on newly written policies less certain credits allowed policyholders for unearned premiums on policies canceled on or about February 9, 1922. Carey, the agent, used the moneys thus raised to pay the insurance companies part or all of what was then overdue them prior to the giving of the bonds under which they sued the defendant surety.

The record is clear that neither the plaintiffs nor their representatives had any communication with the defendant surety. The representatives merely told Claude B. Carey that he would have to give bond, and he went and procured his kinsman, this defendant, to sign the required bonds as surety, and the bonds so executed were mailed to the plaintiffs.

The evidence is somewhat equivocal as to whether the surety, H. J. Carey, knew or had any intimation that Claude B. Carey was delinquent in his remittances to plaintiffs at the time he signed the bonds. He testified:

"Q. Mr. Carey, did you meet some agents of the California Insurance Company here about the time this bond was executed? A. I don't recall that I met them at that time. I know that they were here at that time. They were in conference with Claude Carey. . . .

"Q. What relation is Claude Carey to you? A. An uncle. . . .

"Q. Do you know whether or not this is the first time that any bond had been required of him in his agency? A. Apparently so. He had been writing without a bond up to that time.

"Q. Did you know at that time that Claude B. Carey was indebted to the company for premiums received? A. No, sir. . . . .

*Cross-examination:*

"Q. Who asked you to sign the bond; Claude Carey or somebody from his office? A. Claude Carey. . . .

"Q. Did he tell you why they wanted the bond? A. He didn't have to tell me why.

"Q. You knew why—you knew he was slow in his payments or in arrears or something? A. Yes, sir. . . ."

The trial court rendered judgment for defendant, supplementing it with informal findings which in part read:

"I further find that Claude B. Carey obtained the defendant, H. J. Carey, to execute the bonds required by the state agents for the above named plaintiffs, and that the defendant was not informed, nor had he any knowledge, of the shortage or default of Claude B. Carey in the payments of premiums collected by him.

"It is also very apparent that Claude B. Carey, for the purpose of raising money to square up with plaintiffs, canceled paid-up policies and issued new ones to the Carey companies, receiving additional premiums above the cancellation rebates, and from these extra premiums paid the past due and defaulted premiums on other policies, and failed and neglected to pay the premiums on the new policies; that is, the various policies mentioned and sued on herein as being taken out on the 9th day of February and subsequent thereto. By this scheme Claude B. Carey was able to transfer his past due and defaulted premiums over to futures and to bring apparently under the terms of the bond a liability which was in fact a prior liability, which, had it not been for this switching or kiting, there would have been no liability under the bond, and this kiting or switching process must have been known to the plaintiff companies if they had used ordinary diligence and observation as to what was going on, and the necessary results as well as the purposes of the switch, and in my judgment acting in good faith and using ordinary diligence they were bound to know and did know what Carey was doing, and

lent themselves to this switching of premiums so as to attach a liability under the bonds which did not rightfully belong there and was a fraud upon the bondsmen.

"I also believe that the plaintiffs through their state agents committed a fraud in law in obtaining the bonds sued on without informing the sureties of the already default of their agent and that it was by reason of this default and failure to pay the premiums collected that made them require the bonds so as to continue the agency, and that by reason of the fraud above mentioned, both actual and constructive, there is no liability under the bonds by H. J. Carey to either insurance company."

So far as these findings of the trial court are based on *any* evidence they are, of course, conclusive. This rule of appellate review settles the point as to whether the defendant knew Claude B. Carey was delinquent in his remittances on February 9, 1922, when the bond was executed. Perhaps the point whether the cancellations of outstanding policies on February 9 were made in good faith and in due course of business and new policies issued, or merely as a stratagem to raise funds to meet his shortages existing at that time, is similarly settled. Plaintiffs contend that there was no evidence to support that finding, but we are not prepared to say the circumstances did not justify an inference to that effect. But there was no evidence and no facts to justify an inference that plaintiffs knew of this "switching and kiting" strategy to raise funds to extinguish his overdue indebtedness to plaintiffs; nor were plaintiffs required by any rule of law to exercise "diligence and observation" to discover "what was going on, and the necessary results as well as the purposes of the switch." The record is devoid of evidence or facts which fairly warrant an inference that plaintiffs or their state agent or representatives committed any fraud on defendant, unless their failure to apprise defendant of the exact status of the financial accounts existing between them and Claude B. Carey constituted a fraud as a matter of law; and to the solution of that question we now give attention.

Turning to the law books and decided cases we do not discover that unanimity of opinion which is desirable. (Brandt on Suretyship, §§ 365, 367; 32 Cyc. 64; 12 R. C. L. 306; 21 R. C. L. 991, 992; note in 63 A. S. R. 327 *et seq.*) There is much support for the rule that the obligee of a fidelity bond owes a duty to a person about to become a surety for the future conduct of an officer, agent, or other functionary, to apprise him of any past misconduct involving downright dishonesty, embezzlement or similar criminal delinquency of

which the bonded person has been guilty and of which the obligee was aware. (*Fire, etc., Assurance Co. v. Thompson*, 68 Cal. 208; *Indiana & Ohio Live Stock Ins. Co. v. Bender*, 32 Ind. App. 287; *Belleview Loan and Building Association v. Jeckel, etc.*, 104 Ky. 159; *Franklin Bank v. Cooper*, 36 Me. 179; *Capital Fire Ins. Co. v. Watson*, 76 Minn. 387; *The Third Nat. Bank v. Owen*, 101 Mo. 558, syl. ¶ 2; *Sooy ads. State*, 39 N. J. L. 135; *United States Life Ins. Co. v. Salmon*, 36 N. Y. Supp. 830; *Dinsmore v. Tidball*, 34 Ohio St. 411, 418; *Lauer Brewing Co. v. Riley*, 195 Pa. 449.)

A fair reflection of the court's views in the cases just cited also supports the doctrine that where an agent or employee without bond for a period of time has committed a criminal delinquency known to his principal and the principal is unwilling to continue his agency or employment and trust him without bond, and where a bond is procured while the bondsman is kept in ignorance of such prior derelictions of the agent or employee, the failure of the obligee to inform the bondsman of these matters releases the surety and discharges the bond. Thus in *Capital Fire Ins. Co. v. Watson*, 76 Minn. 387, 389, it was said:

"It is immaterial whether the dishonesty of Watson was disclosed while he was acting as the agent of plaintiff or the agent of some other insurance company. Plaintiff by proposing to take Watson for its agent, impliedly represented that, as far as it knew, he was honest, and that it believed him to be so. If, at this time, it knew that he was dishonest, and a defaulter, it perpetrated a fraud on the defendant sureties in failing to disclose to them its knowledge that he was dishonest and a defaulter. See *Traders Ins. Co. v. Herber*, 67 Minn. 106, 69 N. W. 701; *Lancashire Ins. Co. v. Callahan*, 68 Minn. 277, 71 N. W. 261; *Assurance Manchester F. A. Co. v. Redfield*, 69 Minn. 10, 71 N. W. 709."

On the other hand, there are many well-considered cases which hold that something more than mere silence on the part of the obligee or his mere failure to disclose known facts is necessary to vitiate a fidelity bond. There must be concealment, willful withholding of information asked for, or the making use of some device intended to mislead, to defeat the bond. And to constitute a good defense of concealment in an action by an obligee of a fidelity bond, some affirmative act of misrepresentation or willful concealment of essential facts must appear. Thus in *Magee et al. v. Manhattan Life Ins. Co.*, 92 U. S. 93, 23 L. Ed. 699, a New York insurance company sued the sureties on a bond much like the one at bar, alleging a withholding of the company's money by the agent for whose

fidelity the bond was given and a consequent liability of the defendant sureties under that bond. The defendants pleaded that the company, as a condition upon which it would retain in its employment the agent then largely indebted to it, required such bond, and also his agreement to apply all his commissions thereafter earned to his former indebtedness to it; that the agreement was made, and the commissions were so applied; that the company knew that the agent had no property, and depended upon his future acquisitions for the support of himself and family; that the defendants were ignorant of such indebtedness and agreement; that, had they been informed thereof, they would not have executed the bond; that the agreement as to the commissions and its performance were a fraud on them; and that the bond as to them was thereby avoided. It was held that the plea was bad, as it set forth neither the circumstances attending the delivery of the bond, nor averred misrepresentations, fraudulent concealment, opportunities to make disclosure on the part of the company, inquiries by the sureties before the bond was delivered, or knowledge by the company that the sureties were ignorant of the facts complained of, and further, that this agreement had no such connection with the undertaking of the sureties as to give them a right to be informed thereof, except in answer to inquiries. As none were made, the company was under no obligation to volunteer the disclosure.

In the opinion the court said:

"The plea does not set forth any of the circumstances attending the execution and delivery of the bond. It does not aver that there was any misrepresentation, anything fraudulently kept back, or any opportunity to make disclosures on the part of the company, or any inquiry by the sureties, before the bond was delivered. Nor is it averred that the company was aware that the sureties were ignorant of the facts complained of. It is, perhaps, to be inferred from the plea that the fact was—as the record, aside from the plea, shows it to have been—that the bond was executed at Mobile, and sent by Voorhees by mail to the company in New York. If this were so, the company, upon receiving it, was under no obligation to make any communication to the sureties. The validity of the bond could not depend upon their doing so. The company had a right to presume that the sureties knew all they desired to know, and were content to give the instrument without further information from any source. Under these circumstances, it was too late, after the breach occurred, to set up this defense." (p. 100.)

In *Watertown Savings Bank v. Mattoon*, 78 Conn. 388, which was an action on the fidelity bond of a bank official, the defendant

sureties pleaded that the directors of the bank knew that the officer had committed a prior embezzlement and that they did not inform the defendant sureties. It was held that this constituted no defense when it was not shown that the sureties signed the bond at the directors' request.

In *Sherman v. Harbin*, 125 Ia. 174, 181, where the surety on the bond of the president of a mutual life association did not inquire about the past conduct of the president, the association was not guilty of fraudulent concealment by mere nondisclosure of the fact that he had misappropriated the funds of the association, and the sureties were held to their obligation.

The case of *Hebert v. Lee*, 118 Tenn. 133, 12 L. R. A., n. s., 247, is noteworthy. It recognizes the duty of the obligee to act in the best of faith towards the party about to become a surety on a bond, but in section 2 of the syllabus it was said:

"The mere failure of the obligee in a bond such as that described in the preceding headnote, to inform the sureties thereon, in the absence of investigation or inquiry on their part, that their principal had fallen behind in his accounts until at the time of the execution of the bond, he was considerably indebted to the obligee, does not relieve the sureties from liability, if such undisclosed acts of the principal obligor do not involve moral turpitude, but are such as are consistent with honesty, and only tend to show that he is negligent, dilatory or unskilled."

An excerpt from the opinion reads:

"We think there can be no doubt that the mere failure upon the part of the complainant to inform these sureties of the fact that their principal, Lee, had fallen behind from time to time in his accounts as agent, until his liabilities had amounted at the execution of these two bonds to the sums stated, would not be sufficient to relieve them from liability. If the present case was that— in other words, if this was a case in which the agent was simply behind in his accounts, and the complainant had failed to communicate, in the absence of investigation or inquiry upon the part of the sureties, this fact to them—we think this would not constitute a ground for resisting a recovery on these bonds." (p. 137.)

The opinion discusses New Jersey, Ohio and Georgia cases, some of which we have cited above, in which the rule imposing the duty of disclosure is rigorously applied, but the court continues thus:

"The rule is otherwise if the acts of the agent, undisclosed to his surety, do not involve moral turpitude, but are such as are consistent with honesty, and only tend to show that the agent is negligent, dilatory, or unskilled. In such case the law does not impose the duty upon the obligee, unasked, to give

the surety information of such facts. This distinctive principle is recognized in *Screwmen's, etc., Ass'n v. Smith,* 70 Tex. 168, 7 S. W. 793; *Atlas Bank v. Brownell,* 9 R. I., 169, 11 Am. Rep. 231; *Home Insurance Co. v. Holway,* 55 Ia. 571, 8 N. W., 457, 39 Am. Rep., 179; *Watertown Fire Ins. Co. v. Simmons,* 131 Mass. 85, 41 Am. Rep. 196; *Domestic Sewing Machine Co. v. Jackson,* 15 Lea, 418." (p. 140.)

In an earlier Tennessee case, *Sewing Machine Company v. Jackson, Atkin and Gaut,* 83 Tenn. 418, sureties on the bond of a sewing machine agent resisted liability on the ground that prior to their execution of the bond the agent had fallen into debt to the complainants and that they agreed to continue to furnish him sewing machines to sell, upon his executing a bond with security, with the design to use the means realized on the new business to pay the prior indebtedness, and to make the sureties on the new sales liable to pay the new debts. The sureties also alleged that they did not know of the existing indebtedness of the agent upon previous transactions, at the time they signed the bond, and alleged it was a fraud in complainants not to communicate to them the facts in relation thereto, and that all, or nearly all, of the proceeds of the new business were applied to the old indebtedness, leaving all, or nearly all, of the later purchases unpaid. It was held that the facts alleged in the answer did not constitute a defense. Some of the pertinent headnotes read:

"A failure to disclose to the sureties the previous indebtedness of their principal, when not requested to do so, is no evidence of fraud.

"To hold the surety was discharged because of the omission of the creditor to advise him of the previous transactions between the debtor and creditor, in the absence of any inquiry on the subject, would establish a rule that would make instruments requiring a surety of little value. . . .

"The strict rule in respect to nondisclosures, applied in insurance cases, does not extend to the contracts of suretyship and guaranty."

In the opinion it was said:

"But the strict rule in respect to nondisclosure applied in insurance cases, does not extend to contracts of suretyship or guaranty. If inquired of, the creditor is bound to answer fully and truly. But he is not bound voluntarily, without being asked, to disclose any circumstances unconnected with the particular transaction in which he is about to engage, which will render the position of the surety more hazardous, or to inform him of any matter affecting the general credit of the debtor: Kerr on Frauds, 122; Brandt on Suretyship, sec. 365; 82 N. Y., 127." (p. 425.)

Many other cases to the same effect are summarized in a pertinent note in 12 L. R. A., n. s., 247 *et seq.*

From the foregoing survey of the decided cases it seems necessary to hold that some sort of active fault must attach to the obligee of a fidelity bond before the surety will be released from his obligation. Here the plaintiffs and their representatives who demanded that Claude B. Carey give bonds for his future fidelity did nothing reprehensible to induce H. J. Carey to become surety for his kinsman. They simply did nothing. They had no dealings with the surety, had no communication with him, and were not inquired of touching the risk the surety was solicited by his kinsman to undertake. Moreover, in the cases noted above where the sureties were released because of the mere failure of the obligee to make it his special business to inform the sureties of the prior defalcations, embezzlements and similar derelictions of the person for whose fidelity the bond was required, it seems that actual criminality was involved in the undisclosed delinquencies of the bonded person. It is not a fair analysis of the financial status of Claude B. Carey's accounts with the plaintiffs to characterize that status as one of embezzlement or criminal delinquency. In the matter of handling the companies' moneys which came into his hands as premiums he had 45 days after the end of the month in which he had collected them before he was required to remit the proportionate share of these premiums to the companies. In the discharge of this duty to remit he was not shown to have been a criminal defaulter. He was merely dilatory, negligent, slow. Nothing more. He had not been remitting promptly nor within the specified time he was allowed to retain the funds collected by him.

Under these circumstances this court is constrained to hold that no facts were shown which justified a release of the defendant surety, and it follows that the judgment entered in his behalf must be set aside.

It also appears that there is nothing left of this case to try, and judgment should be ordered as the code provides. (R. S. 60-3317.)

Reversed, with instructions to enter judgment for plaintiffs.