247 F.2d 315
 The HARTFORD ACCIDENT AND INDEMNITY COMPANY, a corporation, Appellant,
v.
STATE OF KANSAS ex rel. Harold R. FATZER, Attorney General, for the benefit of Ben MEITL, Guy C. Sawyer, Gerald F. Meitl, Albert Schroer, N. C. Johnson, Ladimar Skubal, V. L. Skubal, L. J. Skubal, Louise Schroer, Bernard Schifferdecke, Harold H. Derby, Rudolph Skubal, Marion Bremer, Don Ehler, Fred Bremer, C. H. Alstrom, Leo J. Rogers, John Meitl, F. J. Reichert, Anna Schroer, Cloyce Harold, Edna Montgomery, Larry Bremer, Mrs. Fred Bremer, Joan Betts, M. H. Bowman, Gene M. Fortin, Glenn A. Scheare, Commodity Credit Corporation, a public corporation, and all parties similarly situated, Appellees.
 No. 5441.
 United States Court of Appeals Tenth Circuit.
 July 24, 1957.
 Rehearing Denied August 24, 1957.
 
 John Q. Royce, Salina, Kan. (E. S. Hampton, H. H. Dunham, Jr., H. G. Engleman, C. Stanley Nelson and Jack N. Stewart, Salina, Kan., were with him on the brief), for appellant.
 Milton P. Beach, Asst. U. S. Atty., Kansas City, Kan. (William C. Farmer, U. S. Atty., Topeka, Kan., Neil Brooks, Asst. Gen. Counsel, U. S. Dept. of Agriculture, Donald A. Campbell, Atty., U. S. Dept. of Agriculture, Washington, D. C., Giles H. Penstone, Atty. in Charge, U. S. Dept. of Agriculture, Kansas City, Mo., and Harold A. Houske, Kansas City, Mo., Atty., U. S. Dept. of Agriculture, were with him on the brief), for the United States, appellee.
 L. F. Cushenbery, Sp. Asst. Atty. Gen. (John Anderson, Jr., Atty. Gen., Robert E. Hoffman, Asst. Atty. Gen., D. Arthur Walker, William E. Cunningham, Arkansas City, Kan., John M. Bremer, Oberlin, Kan., Kenneth Clark, Hill City, Kan., Ray C. Sloan, Alex M. Fromme, Joseph W. Fromme, Hoxie, Kan., were with him on the brief), for State of Kansas ex rel., appellees.
 Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.
 HUXMAN, Circuit Judge.
 
 
 1
 This action was filed by the State of Kansas for the benefit of the persons named in the complaint against the Hartford Accident and Indemnity Company, herein called Hartford, in the District Court of Decatur County, Kansas, and was thereafter removed to the United States District Court for the District of Kansas. The action was brought to recover the value of grain delivered by the parties in interest to the public warehouse of George Olson, doing business as Schroer Grain Company of Dresden, Kansas, who had defaulted in his obligations to those who had delivered grain to him.
 
 
 2
 The case was referred to the Honorable E. R. Sloan as Master. He held extensive hearings, made detailed findings of fact and conclusions of law, and submitted his report to the trial court. Upon a consideration of the report, the trial court adopted the findings of fact and conclusions of law of the Master and entered judgments for the various claimants against Hartford. The correctness of the amounts found due is not an issue in this case. The only question is whether Hartford is liable on its bonds.
 
 
 3
 It was found that for some time prior to May 30, 1949, Olson controlled and operated three elevators on the right of way of the Rock Island and Pacific Railroad Company at Dresden, Kansas. They were operated as a unit and had a total capacity of 42,000 bushels. During the crop years of 1949, 1950 and 1951, Olson handled an average of more than 300,000 bushels of wheat each year through these elevators. On May 30, 1949, and for some time prior thereto, Olson was duly licensed under the laws of the State of Kansas to operate a public warehouse for grain at Dresden, Kansas, in these three elevators. On July 12, 1949, Olson was advised by letter by the Grain Inspection Department that his warehouse license had expired May 31. On August 9, 1949, he filed an application for a renewal license for storage of grain at Dresden, Kansas, for the year ending May 30, 1950. The application was accompanied by a public warehouseman's bond in the penal sum of $5,000 executed by Hartford. This bond contained this provision:
 
 
 4
 "The condition of the above obligation is such that, whereas, the above-bounden principal on the 31st day of May, 1949, made application for a license to operate the Grain Elevator as a public Warehouse at Dresden, Kansas, County of Decatur, State of Kansas, for the period ending May 31, 1950.
 
 
 5
 "Now, therefore, If the said Principal shall well and faithfully perform all his duties as such Public Warehouseman, then this obligation to be void and of no effect; otherwise to be and remain in full force and effect."
 
 
 6
 The bond was received by the State of Kansas on August 9, 1949, and on September 9, 1949, a warehouseman's license was issued to Olson for the period ending May 30, 1950. Although issued on September 9, 1949, it stated that the license was "effective this 31st day of May, 1949."
 
 
 7
 Olson was again derelict in making timely application for a license for the ensuing year and was reminded of his failure by letter from the Department dated July 12, 1950. He filed his application for his renewal license for the period ending May 30, 1951, on August 19, 1950. This application was likewise accompanied by a bond issued by Hartford in the sum of $5,000 and dated August 19, 1950, and contained the same recitation as set out in the preceding bond. On August 30, 1950, the Department issued Olson a public warehouse license which was identical to the form issued for the preceding year.
 
 
 8
 Olson was again derelict in filing timely application for a license for the next ensuing year and again on July 20, 1951, the Department advised him of such dereliction. Notwithstanding, he made no application for a renewal license until September 10, 1951. On that day he filed his application with the Department again accompanied by a warehouse bond executed by Hartford dated August 29, 1951, in the sum of $5,000. This bond was received by the State of Kansas on September 10, 1951, and on September 15, 1951, a local warehouse license was issued to Olson for that year. Notwithstanding that for each of these years the application for the renewal license was not timely filed and notwithstanding that the date on the bonds and the warehouse licenses were issued months after the beginning of the year in each instance, the license and the bond purported to cover the entire year ending May 30, 1950, May 30, 1951, and May 30, 1952. The Master found that it was the practice of the Grain Inspection Department to issue delayed warehouse licenses and date them back to the beginning of the licensing year.
 
 
 9
 On October 23, 1951, an examination was made of Olson's business and it was found that he was short 30,127 bushels and 50 pounds of wheat. The Commodity Credit Corporation had wheat in storage with Olson and was advised of the shortage in his accounts. On October 29, 1951, the officers of Commodity, Olson, the Chief Grain Inspector, and the Warehouse Examiner had a conference in Kansas City. Commodity and the Chief Grain Inspector knew Olson was short more than 30,000 bushels of wheat at his warehouse. They demanded that Olson furnish an additional warehouse bond in the penal sum of $50,000. Olson made an application to Hartford for the bond in which he represented that he was solvent but this representation was false. Upon receipt of the application, Hartford executed the $50,000 bond. Although the bond was dated November 13, 1951, it recited that
 
 
 10
 "The condition of the above obligation is such that, whereas, the above-bounden principal on the 29th day of August, 1951, made application for a license to operate the Schroer Grain Co. elevators as a public Warehouse at Dresden, Kansas, County of Decatur, State of Kansas, for the period ending May 31, 1952.
 
 
 11
 "Now, therefore, If the said Principal shall well and faithfully perform all his duties as such Public Warehouseman then this obligation to be void and of no effect; otherwise, to remain in full force and effect."
 
 
 12
 On August 17, 1946, Commodity Credit Corporation entered into a contract with Olson for the use of his warehouse facilities with respect to grain owned by it or in its possession which was deposited by a producer and which became security for a loan by Commodity. A supplemental contract of like tenor was in force and effect on the date Olson became a bankrupt. During each of the three years in question, Olson was indebted to Commodity on warehouse receipts and contracts for more wheat than he had on hand.
 
 
 13
 The producer claimants are raisers of wheat who brought their wheat to Olson and deposited the grain in the elevator in open storage. Reference will be made to the term "open storage" hereafter. At the end of each of the three years in question, Olson was indebted to some of the producers for more open storage grain than he had on hand in the elevator. The Master specifically found from the evidence that the inventory of grain on hand as evidenced by Olson's books was less than the outstanding obligations from May 31, 1949, to January 30, 1952, when Olson was adjudged a bankrupt. We do not understand that the findings as outlined above are seriously challenged by Hartford. Its complaint is with respect to the legal conclusions by the Master and of the trial court predicated on such findings.
 
 
 14
 While Hartford urges eight assignments of error for reversal, they present but three questions. They are as follows: (1) Only grain for which a statutory warehouse receipt has been issued constitutes stored grain within the purview of the Act, (2) Olson was not legally licensed as a public warehouseman between May 31, 1949, and September 8, 1949; between May 30, 1950 and August 29, 1950; and between May 31, 1951 and September 18, 1951; and that Hartford therefore is not liable on its bond for any wheat delivered for storage during such periods, and (3) that the $50,000 bond was procured by false and fraudulent representations and is therefore void.
 
 
 15
 The Master's conclusions, adopted by the trial court, are embodied in an able and exhaustive memorandum opinion by the Master. In substance, it was concluded (1) that both grain for which a statutory warehouse receipt had been issued as well as grain left in "open storage" constitute stored grain under the protection of the statutory bonds, (2) that notwithstanding Olson in each year did not apply for a renewal license until several months after the expiration of the license for the preceding business year, the license when issued nonetheless covered the entire year and that Hartford was liable on its bond for the defalcations during the entire year, and (3) that while Olson was guilty of fraud in the procurement of the $50,000 bond, such fraud was not attributable to the depositors of grain so as to relieve Hartford from liability to them.
 
 
 16
 For reasons hereinafter stated, we think these conclusions of law are correct and that there is no reversible error in the case. Assignments of error Nos. 1 and 2 pose questions of state statutory law. No case is cited and our search has failed to reveal one in which the precise questions have been before the State Supreme Court. In the absence of help in that Court's decisions, we can reason only by analogy in determining the state law.
 
 
 17
 We think the conclusion of the Master and the trial court that the Kansas Warehouse Act, Chapter 194 — 1931 Legislature (now 34-223. et seq., G.S. 1949) contemplates that the relationship of a warehouseman and depositors of grain may exist even though no statutory warehouse receipt was issued is correct. The statute defines the purposes of the Act as being (1) for the storage of grain in a licensed warehouse, and (2) the issuance of warehouse receipts. It provides that "Whenever any grain has been received in any public warehouse, * * * and same is not purchased by the * * * owner * * * of such warehouse, such grain shall be considered stored grain." Section 34-227, G.S.1949. The statute further provides that "said grain is to be insured * * * for the benefit of * * * the owners of warehouse receipts and storage receipts issued by any public warehouse * * *." "* * * a party shall not deprive the holder of a warehouse receipt or storage receipt or other interested person of his right of recovery under such policy of insurance." "* * * upon demand by the owner of the grain, or holder of any warehouse receipt, * * * for such grain, * * * make settlement for the value of the grain * * *" (Section 34-236). The following provision of Section 34-237 providing that "* * * grain shall be delivered upon return and cancellation of such receipts, and the unreceipted grain upon the request of the owner or holder of the receipt or receipts" is significant, as is also the provision of Section 34-250 "* * * to deliver the grain upon a demand made either by the holder of a receipt for the grain, or by the depositor * * *"
 
 
 18
 Under the Kansas Statute a licensed warehouseman of a grain elevator acts in a dual capacity. Where wheat is brought to his elevator he may purchase it if the producer wishes to sell, or is required to store it if that is the producer's desire. The statute provides that "Whenever any grain has been received in any public warehouse, * * * and the same is not purchased by the * * * owner * * * of such warehouse, such grain shall be considered stored grain." Section 34-227, G.S.1949. Olson did not purchase the wheat brought to the elevator by the interested parties in this litigation. With respect to the producers, he issued scale tickets to them, showing the amount of wheat which had been delivered without fixing a price for the wheat.
 
 
 19
 The Master and the trial court found that the practice had grown up in Kansas of issuing scale tickets for wheat that was brought to the elevator but was not sold to the elevator operator; that under such circumstances the depositor pays storage and that it is generally recognized that he may demand the return of his grain or grain of a like quality and quantity; that this practice was so general that it amounts to a customary usage in the trade binding on the parties. Such storage is what is commonly known as "open storage." Hartford's contention that only grain for which a statutory warehouse receipt has been issued constitutes stored grain within the purview of the Act is in our opinion not sustained by an analysis of all the provisions of the Act. An interpretation of the various sections of the Kansas Grain Warehousemen Statute leads us to conclude that all grain delivered to a licensed warehouseman which is not sold to him becomes stored grain, and that this results whether a statutory warehouse receipt is issued or whether the deposit of the grain is evidenced by such scale tickets as are involved in this case. We agree with the findings of the Master as adopted by the trial court that under these scale tickets the depositors of wheat did not sell their wheat and had a right to receive it back upon demand; that this wheat was held in storage subject to the orders of the holders of the scale tickets; and that with respect thereto Olson was at all times acting in his capacity as a warehouseman.
 
 
 20
 It is next contended by Hartford that in any event it is not liable on its bond during those periods of time when Olson was operating without his renewal license, notwithstanding that when the license was issued it was made to cover the entire year. The Master and the court concluded that when once the warehouseman comes under the jurisdiction of the Kansas State Grain Inspection Department by applying for and having issued to him a license such jurisdiction ends only when a notice as required by the Act is given that such operator desires to discontinue operating as a public warehouseman and until such notice is given, the surety is not relieved from liability on its bond. The court also concluded that where there was delay in the issuance of a renewal license the inspector could make the license effective as of the date of the expiration of the old license. The court further concluded that in any event the state alone could challenge any irregularity in the issuance of the renewal licenses. We are in accord with those holdings of the trial court.
 
 
 21
 Hartford cites Kipp v. Goffe & Carkener, 144 Kan. 95, 58 P.2d 102, 108 A.L.R. 918, and the late case of Shugar v. Antrim, 177 Kan. 70, 276 P.2d 372, in support of its contention that grain could not become stored grain during the periods Olson did not hold a license. These cases, however, are distinguishable upon the facts. In the Kipp case the elevator operator had never attempted to comply with the Act to bring himself within its provisions. At no time had he applied for a license and none had ever been issued to him. Under these facts the court held that he was not a public warehouseman and was not entitled to receive grain for storage and that all transactions for grain left with him constituted sales. In the Shugar case the warehouseman's license had expired. No application for renewal was ever filed. In fact, shortly after its expiration the operator discontinued business. Under these facts the court quite properly held that he was not under the provisions of the Act and that grain left at the elevator after the expiration of the license was not stored grain.
 
 
 22
 As pointed out, the Master and the court found that in each of the years in question Olson received more grain than he had storage capacity and that the depositors must have known of this condition and that there would be a continuous change in the inventory of the grain in store. From this Hartford argues that the depositors knew that sufficient grain would not be kept on hand in the elevator to satisfy the alleged storage obligation and that, therefore, the transactions did not constitute storage contracts. With this reasoning we cannot agree. The court likened the operation of a warehouse business to the operation of a bank, holding that while the statute contemplates that the warehouseman must have on hand at all times sufficient wheat to fulfill the deposit, in practice this did not follow. The obligation of a warehouseman, as that of a banker, is to deliver the deposited grain upon demand. There is no showing that Olson did not have on hand sufficient wheat to meet all demands made on him with respect to deposited grain prior to November 6, 1951. While Olson received more stored grain than he had storage capacity, no cause of action would accrue thereby in favor of a depositor of grain. He would have a claim against him and his surety only when a demand for the return of the deposited grain was dishonored.[1] The mere fact that Olson received for storage more grain than he had storage capacity did not result in a conversion of any particular grain or prevent any grain offered for storage from becoming stored grain. There can be no conversion of any given depositor's grain until a demand for its delivery has been dishonored. Ordinarily, the making of a proper demand is a condition precedent to the obligation of a warehouseman to deliver the stored grain,[2] so even if there was a misappropriation of stored grain by Olson, it would not result in a cause of action on behalf of a depositor until a demand had been made or the necessity therefor had ceased. The necessity for a demand of course ceased when the receiver was appointed.
 
 
 23
 There is yet another reason why we think Hartford may not escape liability on its bonds. As pointed out, when the renewal licenses were issued they were made to cover the entire year, although issued a number of months after the beginning of the year. Hartford knew this and in each instance was willing to assume the obligation of a surety from the end of the preceding year and make its bond guarantee performance under the license. Under these facts, Hartford will not be heard to say that its liability was limited to a time less than that covered by the license. It is estopped to make such a contention.[3]
 
 
 24
 Neither is Hartford's contention that there is no liability on the $50,000 bond well taken. One contention is that this bond was obtained by false and fraudulent representations. The court found that Olson falsely represented that he was solvent but neither the Grain Department nor the depositors of grain participated in or even knew of these false representations. The court found that in issuing this bond Hartford relied entirely upon Olson's representations, its previous experience with him, upon its agents at Dresden, Kansas, who took the application, and upon a Dun and Bradstreet report. Under similar circumstances, Kansas has held that a surety will not be relieved of its obligations on the bond to the beneficiaries thereof.[4] In the Star case the court said, "From the foregoing survey of the decided cases, it seems necessary to hold that some sort of active fault must attach to the obligee of a fidelity bond before the surety will be released from his obligation."
 
 
 25
 The contention is not well taken that Commodity's or Kansas' failure to inform Hartford of Olson's precarious standing when additional security was required, constituted conduct sufficient to relieve Hartford of liability on its bond. The Kansas Statute made it the duty of the Chief Inspector to acquire additional security when in his opinion the existing security might be inadequate.[5] A similar contention was rejected by the Kansas Court in the Star case (see footnote 4). As stated by the court in that case, neither Commodity nor the State Grain Inspector "did nothing reprehensible to induce [Hartford] to become surety" on the bond. To release a surety from liability on its bond, some sort of active fault must attach to the obligee of the fidelity bond. See Star case, supra.
 
 
 26
 So also must fail the contention that the $50,000 bond was prospective and did not cover losses which had already occurred. The obligation of the bond was "Now, therefore, If the said principal shall well and faithfully perform all of his duties as such Public Warehouseman, then this obligation to be void and of no effect; otherwise to be and remain in full force and effect." The obligation of the warehouseman covered by the bond was "to deliver the grain upon a demand made either by the holder of a receipt for the grain, or by the depositor * * *"[6] This was a prospective obligation and arose in this case after the execution of the bond. Olson breached this obligation by failing to deliver the wheat upon demand, and since the appointment of a receiver obviated the necessity of a demand, the obligation was breached when the receiver was appointed.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 State on Behalf and for Benefit of Reilly v. Farmers' Co-operative Elevator Co., 39 N.D. 235, 167 N.W. 223, L.R.A.1918E, 233
 
 
 [2]
 56 Am.Jur. § 191, p. 409
 
 
 [3]
 William H. Banks Warehouses v. Jean, D.C., 96 F.Supp. 731
 
 
 [4]
 Star Ins. Co. of America v. Carey, 126 Kan. 205, 267 P. 990, 994, 60 A.L.R. 153; Great American Ins. Co. v. O'Neal, 138 Kan. 617, 27 P.2d 201
 
 
 [5]
 Sec. 34-229, G.S.Kan.1949
 
 
 [6]
 Sec. 34-250, G.S.Kan.1949