**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 21 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAREN LLOYD,

                Plaintiff-Appellant,

v.

HORN INC., RIMA, INC. and
SDI OF FORT SCOTT, L.L.C.,

                Defendants-Appellees.

No. 97-3074
(D.C. No. 95-CV-2549)
(D. Kansas)

---

**ORDER AND JUDGMENT***

---

Before **ANDERSON** and **KELLY**, Circuit Judges, and **BRETT**,** District Judge.

---

        Plaintiff-Appellant, Daren Lloyd ("Lloyd") appeals the Order of the United States

District Court for the District of Kansas rescinding the SDI of Fort Scott, L.L.C. Operating

Agreement ("Operating Agreement") entered into by Lloyd and Defendants-Appellees,

---

*     This order and judgment is not binding precedent, except under the doctrines of law
of the case, res judicata, and collateral estoppel. The court generally disfavors the citation
of orders and judgments; nevertheless, an order and judgment may be cited under the terms
and conditions of 10th Cir.R. 36.3.

**    Honorable Thomas R. Brett, District Judge, United States District Court for the
Northern District of Oklahoma, sitting by designation.

Horn, Inc. and RIMA, Inc. The case below was bifurcated into issues of construction of the Operating Agreement and damages. After a trial to the court on the equitable counterclaims of defendants, the district court rescinded the Operating Agreement based on its findings of defendants' unilateral mistake and Lloyd's constructive fraud. It is this ruling which Lloyd appeals. Based on the parties' stipulation as to damages, the district court entered judgment in favor of Lloyd and against defendants in the amount of $17,354.40, the value of Lloyd's capital account. We exercise jurisdiction under 28 U.S.C. §1291 and affirm the trial court.

I. Background

In June 1989 Lloyd was hired as a manager trainee by the owners of an existing Sonic Drive-In in Fort Scott, Kansas - Max Rickerson ("Rickerson") of RIMA, Inc. ("RIMA")[1], Marion Leneev of Leneev, Inc. and John Horn ("Horn"). [Tr. at 68-70, 100-101]. Pursuant to an oral agreement between the owners and Lloyd, Lloyd replaced Horn as manager of the drive-in restaurant on July 1, 1989, receiving $1,200.00 per month in wages and ten percent of the profits. [Tr. at 70-72, 111].

On February 21, 1990, Lloyd entered into a Partnership Agreement with Horn and RIMA[2] whereby Lloyd became Managing Partner and acquired 25% interest in the new partnership, paying $12,500 to Horn and $12,500 to RIMA for his interest.[3] [Tr. at 19, 71;

---

[1] Rickerson was the sole stockholder of RIMA, Inc. [Tr. 15].

[2] In February 1990, Leneev, Inc. was no longer a partner.

[3] The pertinent provision reflecting the contributions of the partners, Section 2.01 Partners' Contribution, states the following:

Plt's Ex. 1, Partnership Agreement, Section 2.01]. The partnership was formed for the purpose of owning, operating and continuing to do business as Sonic Drive-In of Fort Scott ("Sonic Drive-In"). [Plt's Ex. 1, Partnership Agreement, Article 1]. As Managing Partner, Lloyd received a salary of $1,200.00 per month and $25.00 per week car allowance, plus 25% of the net profits. [Plt's Ex. 1, Partnership Agreement, Section 5.03 and Article 3].

Pursuant to the Partnership Agreement, the profits from the operation of the Sonic Drive-In were distributed among the partners according to their respective interests: Lloyd with 25%, RIMA with 37 1/2% and Horn with 37 ½%. [Plt's Ex. 1, Partnership Agreement, Section 5.03 and Article 3]. However, the Partnership Agreement expressly limited the amount Lloyd, as Managing Partner, could realize from his partnership interest should he withdraw or be fired from the partnership. Under the terms of the agreement, if Lloyd withdrew or was fired as Managing Partner, his partnership interest would be valued as the amount of his capital account plus all undistributed earnings through the effective date of withdrawal or termination. [Plt's Ex. 1, Partnership Agreement, Sections 6.01, 7.01, 7.02].

The Partnership Agreement was amended twice, on November 1, 1990 and on February 26, 1992. [Plt's Ex. 2, Amended Partnership Agreement; Plt's Ex. 3, Second Amended Partnership Agreement]. The Amended Partnership Agreement and Second

---

On or before the commencement date of the Partnership, the Partners shall contribute in cash as follows:

| | |
|---|---|
| Darren [sic] T. Lloyd | $25,000.00 new acquisition |
| John Horn | $20,000.00 original contribution |
| Rima, Inc. | $10,000.00 original contribution |

Amended Partnership Agreement did not substantively alter the terms of the Partnership Agreement other than to substitute Horn, Inc. for John Horn as one of the three partners. The partnership continued under the Second Amended Partnership Agreement until the parties entered into the Operating Agreement on June 30, 1995, by which the partnership was converted into a limited liability corporation, SDI of Fort Scott, Kansas, L.L.C ("SDI").

The conversion of the partnership to a limited liability corporation was recommended to Rickerson by Tim Larson ("Larson"). Larson was an attorney for Rickerson and his corporation, RIMA, and also advised Rickerson concerning legal matters pertaining to the Sonic partnership. [Tr. at 26, 55-56]. Rickerson testified that Larson recommended the conversion of the partnership to a limited liability corporation to limit the owners' liabilities. [Tr. at 26]. Rickerson also testified that he directed Larson to prepare the Articles of Organization and Operating Agreement for the formation of SDI and none of the terms was subject to discussion or negotiation with Lloyd. [Tr. at 26-29; Plt's Ex. 4, Articles of Organization; Plt's Ex. 5, Operating Agreement]. After Rickerson, Horn and Lloyd separately reviewed and signed the documents, the Articles of Organization and Operating Agreement were filed with the Secretary of State of Kansas on August 9, 1995. [Tr. at 29, 74-75, 106; Plt's Ex. 4].

Most of the provisions of the Operating Agreement mirrored corresponding provisions of the prior partnership agreements. However, the Operating Agreement reflected the following changes in the form of management of the new limited liability corporation:

5.01 <u>Management of the Company</u>.  Management of the Company shall be vested in the Members.   The Members of the Company initially shall be to-wit:

Daren T. Lloyd                              Horn, Inc.
1700 S. National                           120 S. National
Ft. Scott, KS 66701                        Ft. Scott, KS 66701

RIMA, Inc.
c/o Max K. Rickerson
P.O. Box 431
Chanute, KS 66720

5.04 <u>Designated Managing Member</u>.
(a) There may be a designated Managing Member of the Company who shall have the responsibility to act on behalf of the Company and to carry out the decisions of all the Members by handling the general daily affairs and operations of the Company.  The Managing Member shall inform the Members of any problems of unusual nature with the operations that are not resolved in the regular course of business operations, and the Members shall determine by vote of the majority in interest the action to be taken.

5.06 <u>Additional, Removal, and Replacement of Managing Member or Supervising Member</u>.  The Managing Member or Supervising Member, as the case may be, may be added, removed, and/or replaced by written agreement signed by the Members upon a vote of the majority in interest.

[Plt's Ex. 5, Operating Agreement, Sections 5.01, 5.04 and 5.06].  Although the "Managing Partner" was now designated as the "Managing Member," the Operating Agreement incorporated the prior partnership agreements' restriction on the value of the Manager's interest in the event he were fired to the amount of his capital account plus his pro rata share of all undistributed earnings up to the effective date of termination. [ Plt's Ex. 5, Operating Agreement, Sections 7.01 and 7.02].

On August 16, 1995, Lloyd wrote the following letter to Rickerson and Horn:

Today in the mail, I received copies of Articles of Organization and an Operating Agreement for the above referenced company [SDI].

I want to make clear that I do not desire to be appointed nor will I accept the designation as managing member of SDI of Fort Scott, Kansas, L.L.C. I have no idea to whom you intend to seek or designate as managing member, however, I will be happy to assist in this decision at such time as we may meet for organizational purposes.

I intend to remain as a member of SDI of Fort Scott, Kansas, L.L.C. and continue to receive pro-rata draws. To that end, I will be happy to assist in consultation or supervision as we as members shall decide.

Also, please accept this as my official designation in writing pursuant to paragraph 11.01 that notices and other correspondence should be directed to me at P.O.Box 1027, Fort Scott, Kansas 66701-1027, from and after the date of this letter.

Please contact me at your earliest opportunity so that we may further discuss.

[Plt's Ex. 6]. Following receipt of the letter, Rickerson and Horn met with Lloyd and asked if he planned to continue to manage the Sonic Drive-In. Lloyd answered no, and the meeting ended. [Tr. at 35-36].

By letter dated September 5, 1995, Larson, on behalf of RIMA and Horn, Inc., informed Lloyd that Rickerson and Horn considered Lloyd's August 16, 1995 letter a "withdrawal and resignation" of his position as Managing Member. Alternatively, Larson notified Lloyd that he was expelled as a member of SDI based on his failure to disclose his intent not to manage the Sonic Drive-In once the limited liability corporation was formed. [Plt's Ex. 7].

On December 12, 1995, Lloyd brought suit for breach of the Operating Agreement, seeking the fair market value of his membership interest in SDI and his share of any distributions paid to the members since August 1, 1995, plus punitive damages, costs and

attorney fees.  Defendants Horn Inc., RIMA and SDI counterclaimed for equitable relief seeking  judgment that Lloyd was the Managing Member of SDI under the literal terms of the Operating Agreement, and if not,  based on the conduct and understanding of the parties and other equitable principles, the Operating Agreement should be reformed to so designate Lloyd as Managing Member, or be rescinded.

The trial court bifurcated the case and conducted a bench trial on the issue of rescission or reformation on September 17, 1996.  At the conclusion of the trial, the court found that rescission of the Operating Agreement was warranted based on (1) defendants' unilateral mistake regarding the effect of the Operating Agreement, if, as Lloyd contended, the effect were to change Lloyd's ownership interest to a full equity interest rather than a limited management interest, relieve Lloyd of his management responsibilities, and entitle him to more than the amount of his capital account in exchange for his interest, and (2) Lloyd's constructive fraud and inequitable conduct in remaining silent and concealing his intent to resign as manager as soon as the transition to the limited liability corporation became effective.

After this ruling Lloyd applied for an Order of Partition pursuant to the parties' ownership interests under the Second Amended Partnership Agreement. [Appellee's Ex. D]. Lloyd asked the trial court to effect a partition whereby Lloyd would purchase RIMA's and Horn, Inc.'s partnership interests in the amount of five times the 1995 net earnings of their interests in the partnership, or $848,537.25, or in the alternative, the majority owners

purchase Lloyd's interest for $282,845.75, plus his earned but undistributed profits of the partnership since August 1995. Defendants moved for summary judgment on the question of damages, asserting Lloyd was entitled to $17,354 plus interest, representing the amount of his capital account due under the Second Amended Partnership Agreement.

In its Memorandum and Order of January 29, 1997, the trial court denied Lloyd's Application for an Order of Partition and granted Defendants' Second Motion for Summary Judgment in part and denied it in part. The court found the Second Partnership Agreement governed Lloyd's damages, but the record was insufficient to determine whether Lloyd withdrew from the partnership under Section 7.01 or defendants terminated him under Section 6.01 of that agreement. The court then set the matter for trial. The parties, however, later stipulated that the amount of damages was $17,354.40 regardless of whether Lloyd withdrew or was terminated, and the court entered judgment for Lloyd in that amount. [Appellee's Ex. G]. Lloyd now brings this appeal.

## II. Standard of Review

Lloyd appeals from the decision of the district court, sitting as a court of equity, to rescind the Operating Agreement based on the its findings of unilateral mistake, constructive fraud and inequitable conduct. Ordinarily, "[w]e review a district court's choice of equitable remedies for abuse of discretion." Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 826 (10th Cir.), cert. denied, 510 U.S. 1004 (1993). However, if the "the availability of equitable relief depends upon an interpretation of law," the review is de novo. Downriver

Community Fed. Credit Union v. Penn Square Bank, 879 F.2d 754, 758 (10th Cir. 1989), cert. denied, 493 U.S. 1070 (1990). We review underlying factual determinations for clear error. Rascon v. US West Communications, Inc., 143 F.3d 1324, 1329 (10th Cir. 1998); Estate of Holl v. Commissioner, 54 F.3d 648, 650 (10th Cir. 1995). A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, the Court is left with the definite and firm conviction that a mistake has been made. Raydon Exploration, Inc. v. Ladd, 902 F.2d 1496, 1499 (10th Cir. 1990). Mixed questions of fact and law are reviewed de novo if they involve primarily a consideration of legal principles and under a clearly erroneous standard if the question is primarily a factual inquiry. Rascon, 143 F.3d at 1329.

## III. Analysis

The general rule of contract formation under Kansas law is there must be a "meeting of the minds on all essential elements" of the contract to bind the parties to its terms. Albers v. Nelson, 809 P.2d 1194, 1198 (Kan. 1991). A party to a contract may seek equitable remedies of reformation and rescission when "there is ignorance or a mistake on one side and fraud or inequitable conduct on the other, as where one party to an instrument has made a mistake and the other knows it and fails to inform him of the mistake or conceals the truth from him." Andres v. Claassen, 714 P.2d 963, 969 (Kan. 1986). "Thus, unilateral mistake may be the basis for relief when it is accompanied by the fraud of, or is known to, the other party." Id.

Lloyd argues the trial court erred in rescinding the Operating Agreement as the evidence did not establish either unilateral mistake or constructive fraud. We disagree.

The district court found it was the parties' sole intent in entering into the Operating Agreement to convert the partnership to a limited liability corporation in order to limit their respective liabilities. Horn, Inc. and RIMA, therefore, made a mistake as to the effect of the Operating Agreement if its effect were to relieve Lloyd of his management responsibilities and entitle him to receive more than the amount of his capital account in exchange for his interest. The court also found Lloyd knew or should have known of their mistake at the time of the agreement and concealed from his partners his intent to resign as manager of the Sonic Drive-In until after the conversion was effected, and concluded Lloyd's silence constituted constructive fraud and inequitable conduct. We review these findings for clear error because, although they involve mixed questions of fact and law, the inquiries are predominantly factual. Rascon, 143 F.3d at 1329.

Lloyd does not dispute the parties' intent in entering into the Operating Agreement was to convert the partnership to a limited liability corporation in order to limit the parties' liabilities. Nor does he dispute it was not the intent of RIMA or Horn, Inc. to relieve him of his management responsibilities by the conversion. Indeed, when specifically asked at trial whether Rickerson and Horn would have converted the partnership to a limited liability corporation if they had known Lloyd did not intend to continue managing the business, Lloyd testified, "I am sure that if they thought that I was not going to be a managing member, that

they might not have gone through with this process." [Tr. at 88].

Rather, Lloyd argues the doctrine of unilateral mistake does not apply here where sophisticated business parties executed an unambiguous contract, the legal effect of which was to create a new form of business that permitted operation without the designation of a Managing Member and granted Lloyd a shared interest in the business that could not be terminated by the other members. In other words, the only "mistake" made by Rickerson and Horn was to assume that Lloyd did not intend to enforce the terms of the Operating Agreement which expressly provided that the designation of a Managing Member is permitted, not required: "There may be a designated Managing Member of the Company who shall have the responsibility to act on behalf of the Company and to carry out the decisions of all the Members by handling the general daily affairs and operations of the Company." [Plt's Ex. 5, Operating Agreement, Section 5.04 (emphasis added)]. Further, nothing in the Articles of Organization or the Operating Agreement designated Lloyd as the Managing Member. Thus, under the terms of the agreement, Lloyd was entitled to remove himself from the "sudden death penalty" provision[4] of the Operating Agreement by declining to become the Managing Member.

The trial court's decision to rescind the Operating Agreement, however, did not turn

---

[4] The "sudden death penalty" provision refers to Section 7.01 of the Operating Agreement which limited the value of the Managing Member's interest in the limited liability corporation upon termination to the amount of his capital account plus his pro rata share of all undistributed earnings.

on an interpretation of the contract. The issue before the court was one of contract avoidance, not interpretation. For the purpose of its analysis, the court assumed Lloyd's interpretation of his management obligations, or lack thereof, under the Operating Agreement.[5] The district court determined Rickerson and Horn entered into the Operating Agreement under the mistaken assumption Lloyd would continue to manage the Sonic Drive-In; this assumption was material to the agreement; and Lloyd knew or should have known of their mistake at the time of formation. These findings are not only clearly supported by the record, they are undisputed.

The relevant inquiry on appeal, therefore, is not whether the trial court erred in finding unilateral mistake but whether the court erred in concluding Lloyd's silence constituted constructive fraud or inequitable conduct to permit rescission of the Operating Agreement. The general rule under Kansas law is a unilateral mistake will not excuse nonperformance of a contract, absent fraud or inequitable conduct. Albers, 809 P.2d at 1198. Constructive fraud is defined as "a breach of a legal or equitable duty which, irrespective of the moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty of purpose or intent to deceive is necessary." Andres, 714 P.2d at 970. In finding constructive fraud, the trial court did not identify the

_____

[5] The district court did note "[t]he Articles of Organization and Operating Agreement were at variance with the parties [sic] prior dealings and expressed manifestations of intent which so far as the evidence discloses was only to convert the partnership to an L.L.C. in order to limit the liabilities of the respective parties." [Appellee's Ex. C, Order dated September 17, 1996].

-12-

nature of the duty Lloyd owed and breached with his silence. However, the existence of a duty was implicit in the court's finding "defendants were necessarily deceived and that in the circumstances, the plaintiff has to be charged with the natural consequences of his acts which were to deceive the defendants." [Tr. at 152]. The court also found Lloyd's conduct under these same circumstances constituted inequitable conduct.[6]

Constructive fraud or fraud by silence is premised on a party's obligation or duty to speak. Andres, 714 P.2d at 970; Ensminger v. Terminix Int'l Co., 102 F.3d. 1571, 1573 (10th Cir. 1996) (interpreting Kansas law). "A suppression or concealment of the truth is not at all times such fraud or deceit as will be relieved against. It must be a suppression or concealment of facts which the party is under a legal or equitable obligation to communicate and in respect of which he could not be innocently silent." DuShane v. Union Nat'l Bank, 576 P.2d 674, 678-79 (Kan. 1978). "The question of what gives rise to a legal or equitable obligation to communicate is not always an easy question to resolve, but generally the duty must arise from a relationship existing between the parties when the suppression or concealment is alleged to have occurred." Id. at 679.

We agree with the trial court that under the circumstances of this case, Lloyd had an obligation to inform his partners he did not intend to continue to manage the Sonic Drive-In once the Operating Agreement was in place. Lloyd was a partner with Rickerson and Horn

---

[6] It is unclear what the parameters of "inequitable conduct" are under Kansas law. However, as we affirm the trial court's finding of constructive fraud, we need not reach the issue.

or their related corporate entities for almost five years. As such, he was accountable as a fiduciary to the partnership. Kan.Stat.Ann. §56-321; Denison State Bank v. Madeira, 640 P.2d 1235, 1241 (Kan. 1982) (finding two types of fiduciary relationships: those created by contract and those "implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions"). As Managing Partner, Lloyd had a particular duty to his partners to disclose any intent to discontinue his management obligations as he was responsible for the day-to-day operation of the business and his management was pivotal to its financial success. DuShane, 576 P.2d at 679 (finding duty to speak if the parties to a bargain are in a fiduciary relationship to one another). However, at no time did he inform his partners that he did not intend to continue managing the business once the conversion to a limited liability corporation was effected. [Tr. at 82-83].

Lloyd claims Rickerson and Horn should have known of his intention not to continue as manager because he expressed his wishes to them in May of 1989 "to get into Sonic and become a partner and progress," [Tr. at 69] and told Horn in June of 1995 that he wanted "to get into some other drive-ins" and if anything else came along, he "was going to take it." [Tr. at 75-76]. These vague statements, however, are insufficient to have alerted Rickerson and Horn that Lloyd did not intend to be Managing Member under the Operating Agreement, particularly when Lloyd had acted as managing partner under the three prior partnership agreements over the preceding five years.

-14-

The findings of the trial court of unilateral mistake and constructive fraud are supported by the evidence and warrant the court's equitable rescission order. Accordingly, we affirm for substantially the reasons stated by the district court in its Order of September 17, 1996.

Entered for the Court

Thomas R. Brett
Senior United States District Judge